**WHEELING–PITTSBURGH STEEL CORPORATION, Appellant,**

v.

**Alexander McCUNE and Bill L. Van Divner.**

**WHEELING–PITTSBURGH STEEL CORPORATION, Appellant,**

v.

**Alexander McCUNE and Bill L. Van Divner and United Transportation Union.**

**WHEELING–PITTSBURGH STEEL CORPORATION,**

v.

**Alexander McCUNE and Bill L. Van Divner and United Transportation Union, Appellants.**

**Nos. 87–3017, 87–3066 and 87–3072.**

United States Court of Appeals, Third Circuit.

Argued Sept. 11, 1987.

Decided Dec. 30, 1987.

David B. Fawcett, III (argued), M. Bruce McCullough, Buchanan, Ingersoll, Pittsburgh, Pa., Ronald S. Orr, Gibson, Dunn & Crutcher, Los Angeles, Cal., Deborah L. Schrier–Rape, Gibson, Dunn & Crutcher, Denver, Colo., for appellant.

Paul E. Moses (argued), Evans, Ivory, Moses, Hollander & McVay, Pittsburgh,

155

Pa., for appellees Alexander McCune and Bill L. Van Divner.

T.P. Shearer (argued), United Transp. Union, Pittsburgh, Pa., for Appellee United Transp. Union.

Before SLOVITER and STAPLETON, Circuit Judges, and BROTMAN, District Judge [*].

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

### INTRODUCTION

Monessen Southwestern Railway Company ("MSW"), a subsidiary of appellant Wheeling–Pittsburgh Steel Corporation ("Wheeling-Pitt"), filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. Appellee United Transportation Union ("Union"), contending that the provisions of Subchapter IV of that Chapter governing railroad reorganizations are applicable, filed a motion for the appointment of a trustee, as is required in railroad reorganizations. *See* 11 U.S.C. § 1163 (1982 & Supp. IV 1986). Appellees Alexander McCune and Bill Van Divner, MSW employees who had settled their claims under the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51–60 (1982), against MSW for $65,000 and $60,000 respectively, but who had not received payment, filed separate motions in the bankruptcy court to require MSW to comply with 11 U.S.C. § 1171(a). That section provides priority as an "administrative expense", for personal injury claims of employees of a railroad reorganizing under Subchapter IV.

The bankruptcy court denied the appellees' motions on the ground that MSW is not a common carrier and therefore not subject to the provisions of Subchapter IV. The district court reversed the bankruptcy court's finding on the "common carrier" issue but nonetheless refused to order com-

---

[*] Hon. Stanley S. Brotman, United States District Court for the District of New Jersey, sitting by    designation.

pliance with provisions of Subchapter IV; instead the court stayed the bankruptcy court's proceedings. MSW appeals, arguing both that the district court erred on the common carrier issue and abused its discretion in entering the stay. The Union, McCune and Van Divner cross-appeal from the district court's refusal to order compliance with sections 1163 and 1171 of Subchapter IV, as well as its entry of a stay of the bankruptcy proceedings.

## II.

### FACTS

MSW operates a railroad over approximately thirty-eight miles of track in and around the Wheeling–Pittsburgh Steel plant in Monessen, Pennsylvania. The railroad delivers slag, a by-product of Wheeling–Pitt's steel operations, to Wheeling–Pitt's dump for processing. MSW was chartered in 1912 for the purpose of operating a railroad for "public use" and has conducted business since at least 1930 under a "certificate of public convenience" issued by the State of Pennsylvania recognizing it as a "common carrier" under Pennsylvania law.

In 1980, MSW applied to the Pennsylvania Public Utilities Commission ("PaPUC") for a certificate of public convenience pursuant to section 1102(a)(2) of the Public Utility Code, 66 Pa. Cons. Stat.Ann. § 1102(a)(2) (Purdon 1979), authorizing it to abandon as a common carrier all of its railway tracks in the City of Monessen and the Township of Rostraver, in Westmoreland County, and to cease operations as a common carrier. The railroad claimed that its services were no longer necessary or proper for the service, accommodation, or convenience of the public as the only user and customer it serviced was its parent, Wheeling–Pitt, and that it had not rendered or been requested to render services to any other shipper for at least the ten years previous to its application.

The Administrative Law Judge ("ALJ") to whom the matter was referred held a hearing at which counsel for three unions, including appellee Union, participated in op-

position to MSW's application. The ALJ noted that MSW and Wheeling–Pitt entered into an agreement with Rostraver Township for maintenance by MSW of the only public at-grade crossing on its track and that MSW agreed with the Pennsylvania Department of Transportation that MSW would maintain the rail highway crossings. The ALJ also noted that none of the three companies on MSW's line opposed its application. Nonetheless, the ALJ refused to grant MSW its requested decertification as a common carrier, in part because he believed there might be a potential future need for rail service. The PaPUC affirmed.

On appeal, the Commonwealth Court reversed, holding that the evidence "clearly supports a finding that the public is not presently being served by the common carrier" and that two other railroads service the area and are available for future and alternative service. *Monessen Southwestern Railway Co. v. Pennsylvania Public Utilities Commission*, 82 Pa. Cmwlth. 13, 18–19, 474 A.2d 1203, 1206 (1984). The court noted that under the applicable Pennsylvania statute, 66 Pa. Cons. Stat.Ann. § 1102(b), the PaPUC, as a condition of its approval of abandonment of a railroad's common carrier status, shall require "a fair and equitable arrangement to protect the interests of railroad employees affected." It therefore remanded the case to the PaPUC for this purpose. 82 Pa.Cmwlth. at 20, 474 A.2d at 1206–07.

The PaPUC and the unions appealed to the Pennsylvania Supreme Court, which affirmed the order of the Commonwealth Court. *Monessen Southwestern Railway Co. v. Pennsylvania Public Utilities Commission*, 507 Pa. 586, 493 A.2d 666 (1985). The Pennsylvania Supreme Court rejected the unions' argument that MSW's application should be denied to protect the interests of the workers, stating that "that does not defeat [MSW's] right to cease to operate as a common carrier when it does not meet the statutory definition thereof." *Id.* at 591, 493 A.2d at 668–69. The Court held that the Commission may not use worker interests to disallow cessation of the common carrier status that would otherwise be

permissible. It remanded the case to the PaPUC for the sole purpose of proceedings under the labor protection provisions of the state Public Utility Code. *Id.* at 591, 493 A.2d at 669.

On remand, the PaPUC granted FELA claimants, apparently including appellees McCune and Van Divner, the right to intervene in the proceedings to determine what "fair and equitable" arrangement should be provided for the employees affected by MSW's abandonment of its common carrier status. Apparently, MSW is appealing this decision. The PaPUC has yet to grant MSW its certificate of public convenience. Thus, as of this date, MSW remains certified as a common carrier under Pennsylvania law, despite the determination of the Pennsylvania Supreme Court that MSW is not a common carrier.

On April 16, 1985, while the appeal was pending in the Supreme Court of Pennsylvania, MSW, along with its parent Wheeling–Pitt, filed a petition for reorganization under Chapter 11. The bankruptcy court denied appellees' motions to order MSW to comply with the provisions of Subchapter IV, holding that "[t]he Pennsylvania Supreme Court finally determined that MSW is in fact *not* a common carrier and therefore is entitled as a matter of substantive law to decertification as a public utility." App. at 16. The court stated that the fact that the PaPUC has not formally decertified MSW as a public entity is inconsequential for bankruptcy purposes, and declined to "exalt form over substance to no justifiable end." *Id.*

On appeal, the district court issued a two-page order which appears to hold that MSW is a railroad for purposes of reorganization under the Bankruptcy Code. The court stated:

[I]t appears from the record that Monessen Southwestern Railway Company was incorporated as a railroad in 1912, and was operated as a railroad for many years thereafter up to the present time and has acquiesced in regulation as such by the Pennsylvania Public Utilities Commission ... and that its status as such remains unchanged until permission un-

der 66 Pa.C.S.A. § 1102(a)(2) to cease operations is granted by the PUC.

App. at 8. The court then added that: under 11 U.S.C. 1161 *et seq.* (including 1163 and 1171) ... short-line and industrial railroads are considered ... to be railroads even though owned by industrial corporations (business reasons for such ownership of rail subsidiaries being, for example, receipt of divisions of line-haul rates and co-ordination of rail movements with industrial operations within the plant).

*Id.*

In spite of these conclusions, however, the district court did not direct appointment of a trustee under section 1163 as required for railroad reorganizations or grant the FELA claims of McCune and Van Divner priority status under section 1171, because it said such orders "would have little practical utility and result in considerable delay" in the present case. *Id.* Instead, the court entered a stay of all proceedings in bankruptcy court until the PaPUC completes the process of granting MSW permission to abandon its operations as a common carrier. It stated that thereupon, the bankruptcy court could decide what treatment under federal bankruptcy law to give any obligations or liabilities the PaPUC had imposed on the MSW. *Id.* at 9. This appeal followed.

### III.

#### APPELLATE JURISDICTION

We first address, on our own initiative, the issue of our jurisdiction. This court has jurisdiction to hear appeals from final judgments entered by the district court in its appellate capacity. 28 U.S.C. § 158(d) (Supp. III 1985).

We have consistently recognized that finality must be viewed pragmatically in bankruptcy appeals. *See, e.g., In re Meyertech Corp.,* 831 F.2d 410, 414 (3d Cir. 1987); *In re Christian,* 804 F.2d 46, 47–48 (3d Cir.1986); *see also In re Amatex Corp.,* 755 F.2d 1034, 1039 (3d Cir.1985) (discussing pragmatic approach to bankruptcy appeals under 28 U.S.C. § 1291). We have

explained that bankruptcy cases "frequently involve protracted proceedings with many parties participating. To avoid the waste of time and resources that might result from viewing discrete portions of the action only after a plan of reorganization is approved, courts have permitted appellate review of orders that in other contexts might be considered interlocutory." *Id.; accord In re Brown,* 803 F.2d 120, 121–22 (3d Cir.1986). Thus we have found jurisdiction, for example, over an order granting a petition to intervene, *In re Marin Motor Oil,* 689 F.2d 445 (3d Cir.1982), *cert. denied,* 459 U.S. 1206, 103 S.Ct. 1196, 75 L.Ed.2d 440 (1983); over an order partially remanding the calculation of an award to the bankruptcy court, *In re Meyertech,* 831 F.2d 410; and over an order denying a motion to dismiss a debtor's Chapter 7 case, *In re Christian,* 804 F.2d 46. *But see In re Brown,* 803 F.2d 120 (remand to bankruptcy court for computation of damages not final order where order will not affect distribution of assets or present threat of a later appeal undoing result of bankruptcy proceedings.)

*In re Meyertech* sets forth useful indicia to be employed in "balancing a general reluctance to expand traditional interpretations regarding finality and a desire to effectuate a practical termination of the matter" at bar. 831 F.2d at 414. These include the impact of the disputed issue on the assets of the bankruptcy estate, the necessity for additional fact-finding on a remand, the preclusive effect of this court's decision on the merits of subsequent litigation, and the furtherance of judicial economy. *Id.* Application of that analysis to this case clearly justifies the exercise of appellate jurisdiction.

The core issue here is whether the district court properly ruled that MSW is a railroad for purposes of federal bankruptcy law unless and until it is decertified as a common carrier by PaPUC. The issue of MSW's compliance with 11 U.S.C. §§ 1163 and 1171 are obviously interwoven with this question. Because MSW's designation as a railroad would, for example, require under Subchapter IV of Chapter 11 the payment of personal injury claims like those of McCune and Van Divner as administrative expenses, there can be no doubt that the answer to this question will affect the estate's assets. There is no need for further fact-finding here, and this court's decision of the legal issue could allow a now long-delayed bankruptcy proceeding to move ahead.

■ That the district court's decision was made in connection with a stay does not preclude its order from being treated as final. Although stay orders are usually not appealable, there is an exception where an "indefinite stay order unreasonably delays a plaintiff's right to have his case heard." *See generally Cheyney State College Faculty v. Hufstedler,* 703 F.2d 732, 735 (3d Cir.1983) (surveying case law on appealability of stays). In this case, the stay is indefinite, and the proceedings before the PaPUC, which have been pending for more than seven years, do not appear to be close to conclusion. MSW sought to reorganize in conjunction with its parent Wheeling–Pitt and other affiliated companies. The stay of MSW's reorganization puts it behind the others, and, if it adversely affects a unified reorganization, may cause irreparable harm. Thus, this case, although factually distinguishable from *Haberern v. Lehigh & New England Railway Co.,* 554 F.2d 581, 584 (3d Cir.1977), nonetheless is also "rife with special circumstances which bring it outside the general rule and so limit its precedential value as to not measurably weaken our continued aversion to piecemeal appeals." We are therefore satisfied that we have appellate jurisdiction.

## IV.

### DISCUSSION

#### A.

#### Applicability of 11 U.S.C. § 1163

We turn then to a consideration of the merits of the appeal. We have plenary review to decide whether the existence of a state "certificate of public convenience" designating a railroad as a "common carri-

er," without more, requires application of Subchapter IV of Chapter 11 of the Bankruptcy Code to that railroad's reorganization.

We have found no case on point, and counsel have not called our attention to one. Therefore, we must reach the result through analysis of the statutory scheme and attempt to divine therefrom congressional intent.

Little assistance is provided by the language of the statute. The provisions covering railroad reorganizations found in Subchapter IV of Chapter 11 of the Bankruptcy Code are stated to be applicable "in a case under such chapter concerning a railroad." 11 U.S.C. § 103(g) (1982 & Supp. IV 1986). The Code also provides that certain enumerated sections of Chapter 11 are inapplicable "in a case concerning a railroad." 11 U.S.C. § 1161. A "railroad" is defined as follows:

> "railroad" means common carrier by railroad engaged in the transportation of individuals or property or owner of trackage facilities leased by such a common carrier.

11 U.S.C. § 101(38) (1982 & Supp. 1986). The predicate for "railroad" status, i.e., "common carrier" status, is not defined in the Code.

The essence of MSW's position is that it is not in fact a "common carrier", and therefore does not fall within the definition of "railroad" for purposes of the application of Subchapter IV governing railroad reorganizations. The Union and the FELA claimants argue that as long as there is a certificate from the PaPUC covering MSW as a "common carrier", it is a common carrier and hence a "railroad" under the Bankruptcy Code and will remain so until the PaPUC decertifies it.

Until the Bankruptcy Code was amended in 1978 to cover intrastate as well as interstate railroads, this issue could not have arisen.[1] In expanding the definition previously contained in former section 77 of the Bankruptcy Act, the Senate Report explains only:

> The effect of the [new] definition ... is to eliminate the limitation now found in section 77 of the Bankruptcy Act [former section 205 of this title] that only railroads engaged in interstate commerce may proceed under the railroad reorganization provisions. The limitation may have been inserted because of a doubt that the commerce power could not reach intrastate railroads. Be that as it may, this bill is enacted under the bankruptcy power.

S.Rep. No. 989, 95th Cong., 2nd Sess. 26 (1978), *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 5812.

Under former section 77(d), the railroad debtor filing for reorganization had to submit its plan of reorganization both to the bankruptcy court and the Interstate Commerce Commission. The I.C.C. was given the responsibility and authority under section 77(d) to hold hearings on the plan and then either approve, modify or reject the plan. The bankruptcy court could not approve a reorganization plan unless it were first approved by the I.C.C.: "No plan shall be approved or confirmed by the judge in any proceeding under this section unless the plan shall first have been approved by the Commission and certified to the court." Act of August 27, 1935, ch. 774, § 77(d), 49 Stat. 911, 918.

Under the 1978 Bankruptcy Code, the requirement that the I.C.C. approve any railroad reorganization plan has been eliminated. The Bankruptcy Code now provides:

> The Commission, the Department of Transportation, and any State or local commission having regulatory jurisdiction over the debtor may raise and may appear and be heard on any issue in a case under this chapter, but may not

---

1. Under former section 77 of the Bankruptcy Act,

   The term "railroad corporation" as used in this amendatory section means any common carrier by railroad engaged in the transporta-

tion of persons or property in interstate commerce, [with certain exceptions inapplicable here].

Act of August 27, 1935, ch. 774, § 77(m), 49 Stat. 911, 922.

appeal from any judgment, order, or decree entered in the case.

11 U.S.C. § 1164 (1982).

■ The contraction in the 1978 Code of the I.C.C.'s role in railroad reorganizations appears to have stemmed from a recommendation in the Report of the Commission of the Bankruptcy Laws of the United States, July 1973, 93d Cong., 1st Sess., H.R.Doc. No. 137, *reprinted in Collier on Bankruptcy* App. 2, at 1–1 (hereafter "Report"), which described section 77 as "too complex". Report at 264. The Commission was concerned that unnecessary delays were occasioned by duplicative hearings and appeals by virtue of the I.C.C.'s role and the high cost of conducting reorganization litigation in more than one forum and geographic location. *Id.* at 266. Significant for our purposes was the Commission's concern "that much time is spent in waiting for a determination by the Interstate Commerce Commission, which, obviously, is pressed with matters other than a particular reorganization proceeding." *Id.* It appears unlikely that Congress, which adopted the Bankruptcy Commission's suggestion to limit the I.C.C.'s role to one of a supervisory and advisory nature, intended the bankruptcy court to give any greater role to a state regulatory commission. It, like the I.C.C., can be heard, but its failure to decertify a railroad cannot be conclusive of the railroad's status as a common carrier.

The issue of MSW's status as a common carrier was before the bankruptcy court on the motions of the Union, McCune and Van Divner to apply the bankruptcy provisions applicable only to railroads. Also before the court were copies of all decisions made in the state proceedings culminating in the Pennsylvania Supreme Court's holding that MSW is not serving the public as a common carrier, that there is no reasonable likelihood that it would be performing such services in the future, and that such service in the area in which MSW is located is undertaken by two other railroads who apparently are common carriers.

It is disingenuous for McCune and Van Divner to suggest that they did not have the opportunity to be heard before the bankruptcy court on the common carrier issue. Both their counsel and the Union's counsel were present at the hearing before the bankruptcy court on July 29, 1985 when they could have argued, but did not, that there were additional facts relevant to MSW's common carrier status which the bankruptcy court should notice. The court asked counsel to comment on whether the Pennsylvania Supreme Court's opinion resolved the issue, but no counsel stated that further factfinding was required. Instead, counsel for the Union argued only:

> And to get down to the court's basic question, I think that the railroad is a common carrier until the Public Utility Commission issues a certificate, and it can't issue the certificate until the labor protection matter is resolved, as required by the law and the courts.

Transcript of July 29, 1985, at 10–11. Indeed, counsel for the UTU conceded, "I will agree that the Supreme Court's decision was dispositive of the matter as to whether or not they are a common carrier.... They are no longer a common carrier. Judges have spoken on the Supreme Court. But the decision has not issued, so technically they are a common carrier." Transcript of July 29, 1985 at 18–19.

■ The issue of which of two federal bankruptcy schemes is applicable is a federal determination based on federal policy. However, a state certification of a railroad as a common carrier would ordinarily be presumptive evidence that the railroad is indeed a common carrier because it does not appear that the issue would be decided differently under state or federal law. When, however, the Supreme Court of the relevant state finally determines that the railroad is not a common carrier notwithstanding a certificate, the presumption ordinarily given to such state certification has been overcome.

Whether we look to federal or state law, the essence of common carrier status is service of the public interest. In fact, one of the principal distinctions between the provisions governing railroad reorganizations and those governing non-railroad re-

organizations is that in railroad reorganizations, "the court and the trustee shall consider the public interest in addition to the interests of the debtor, creditors, and equity security holders." 11 U.S.C. § 1165.

■ The fact that a railroad is wholly owned by an industrial corporation does not mean that it may not be a common carrier subject to the railroad reorganization provisions.[2] The central issue is instead whether it meets the general definition of a common carrier:

A common carrier has been defined generally as one who holds himself out to the public as engaged in the business of transportation of persons or property from place to place for compensation, offering his services to the public generally. The distinctive characteristic of a common carrier is that he undertakes to carry for all people indifferently, and hence is regarded in some respects as a public servant.

*Lone Star Steel Co. v. McGee,* 380 F.2d 640, 643 (5th Cir.), *cert. denied,* 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967) (quoting *Kelly v. General Electric Co.,* 110 F.Supp. 4, 6 (E.D.Pa.)), *aff'd,* 204 F.2d 692 (3d Cir.), *cert. denied,* 346 U.S. 886, 74 S.Ct. 137, 98 L.Ed. 390 (1953).

■ In light of the failure of the parties to adduce any evidence to the bankruptcy court on the issue of MSW's status as a common carrier other than that summarized in the decisions of the PaPUC and the Pennsylvania courts, the bankruptcy court's finding that MSW is not a common carrier was not clearly erroneous. There was absolutely no evidence that it offered its services to the public generally. We have already explained that the bankruptcy court did not err as a matter of law in refusing to base its decision on the outstanding state certificate, in light of the Pennsylvania Supreme Court decision. It follows that the district court erred in staying the bankruptcy proceedings in order to

await the conclusion of the PaPUC's decision.

**B.**

*The Equitable Estoppel Claim Predicated on 11 U.S.C. § 1171*

McCune and Van Divner argue that even if MSW is not now a common carrier and therefore no trustee need be appointed, they are nonetheless entitled to the priority which FELA claimants are accorded under railroad reorganizations pursuant to 11 U.S.C. § 1171. Each of these parties presents a sympathetic factual situation.

McCune suffered injuries to his back in June 1981 while operating a locomotive for MSW. He brought suit against MSW under the FELA to recover for these injuries. Trial in the case did not begin until November 28, 1984, over three years after the date of the injury. Two days later, MSW agreed to settle his claim for $65,000. Almost five months later, on April 16, 1985, the day MSW filed its petition for reorganization, it tendered him a check for $65,000. However, the account upon which the check had been drawn had already been closed.

Similarly, Van Divner was injured while working on the MSW in October 1981; he also filed an FELA claim against the railroad. That claim was settled by MSW for $60,000 on April 8, 1985, only eight days prior to MSW's filing of its petition. MSW has not paid Van Divner the settlement amount due. Both FELA claimants now argue that these circumstances effect an equitable estoppel under which they are entitled in a non-railroad reorganization to the priority afforded to FELA claims in railroad reorganizations under 11 U.S.C. § 1171.

An understanding of the legislative history and purpose behind 11 U.S.C. § 1171 is necessary to consideration of the FELA

**2.** There was ample reason to regulate industrial railroads, because they could otherwise discriminate on behalf of their proprietary interests to the disadvantage of other shippers. *See* 2I. Sharfman, *The Interstate Commerce Commission* 156–59 (1931). However the question here

is whether MSW should be so treated in light of the fact that it has performed no rail services for anyone other than its parent for a substantial period, and does not contemplate such service or need in the future.

claimants' equitable estoppel claim. Congress provided priority for "claims for personal injuries to employees of a railroad corporation" subordinate only to costs of administration when it first passed legislation governing the reorganization of railroads in 1933 by adding section 77 to the Bankruptcy Act of 1898. Act of March 3, 1933, ch. 204, § 77(s) 47 Stat. 1467, 1482. When section 77 was substantially amended in 1935, the subsection granting priority status to the claims of injured employees or those of the personal representatives of deceased employees was retained: in the 1935 version these claims were to be "preferred against and paid out of the assets of such railroad." Act of August 27, 1935, ch. 774, § 77(n), 49 Stat. 911, 923. This provision remained in force in substantially the same form until its expansion in 1978, the present 11 U.S.C. § 1171, to include all tort claims.[3] In short, Congress has, since it first considered the complexities of railroad reorganization, steadfastly sought to afford utmost protection to the injured employees and families of the deceased employees of bankrupt railroads.

The Supreme Court, in upholding the constitutionality of section 77(n) of the Bankruptcy Act, stated that "[i]t is manifest that the reasonable classification of claims as entitled to priority *because of superior equities* may be the subject of determination by Congress in providing for the distribution of assets in bankruptcy proceedings." *Carpenter v. Wabash Railway Co.*, 309 U.S. 23, 28, 60 S.Ct. 416, 418, 84 L.Ed. 558 (1940) (emphasis added); *accord Thompson v. Siratt*, 95 F.2d 214, 217 (8th Cir.1938).

This court, in holding that personal injury claims under FELA against a railroad in reorganization should bear interest from the date of the entry of judgment or approval of settlement, referred to the "special recognition" Congress gave personal injury claims of employees of railroads in reorganizations. *In re Central Railroad*

*Company*, 479 F.2d 424, 425 (3d Cir.1973). We stated that, "[t]he policy which underlies the preferred treatment of injured employees is understandable as an attempt to cause the business and those who have contributed to its financing to bear the personal risk assumed by those actually operating the enterprise." *Id.* at 426 (quoting 5 *Collier on Bankruptcy*, 14th Ed. § 77.21, fn. 25 (citations omitted)); *see also Haberern v. Lehigh & N.E. Railway Co.*, 554 F.2d 581, 584 (3d Cir.1977) ("The injury and pension claims of ... an employee who contributed most of his life to the service of the railroad, are entitled to greater consideration than those of the ordinary creditor.").

Although McCune and Van Divner do not refer us to any precedent permitting FELA claimants to assert equitable estoppel as a basis for priority in non-railroad reorganizations, there are instances in which courts have applied the principles of equitable estoppel to accord priority to certain other types of claimants in reorganization proceedings. *See, e.g., In re Howard's Appliance Corp.*, 69 B.R. 1015, 1021 (Bankr.E.D. N.Y.1987) (where debtor's own actions caused creditor not to perfect its security interest, debtor equitably estopped from denying that creditor had perfected security interest); *see also In Re Chicago Pacific Corp.*, 773 F.2d 909, 918 (7th Cir.1985) (creditor estopped from asserting claim against debtor in bankruptcy where creditor had "induced the Trustee to believe that it had abandoned its claim against [the debtor]"); *In Re Caro Area Services for the Handicapped*, 53 B.R. 438, 441–42 (Bankr.E.D.Mich.1985) (applying principle of judicial estoppel to prevent debtor from including property in its estate in bankruptcy that it previously failed to list among its assets).

■ Parties claiming equitable estoppel must establish that (1) a representation of fact was made to them, (2) upon which they

---

**3.** In 1978 11 U.S.C. 205(a) was amended to expand the protection granted to encompass "any claim of an individual or ... against the debtor or the estate, for personal injury to or death of such individual arising out of the operation of the debtor or the estate, whether such claim arose before or after the commencement of the case." 11 U.S.C. § 1171(a) (1982).

had a right to rely and did so rely, and (3) that the denial of the represented fact by the party making the representation would result in injury to the relying party. *See Rosen v. Hotel and Restaurant Employees Union*, 637 F.2d 592, 597 (3d Cir.), *cert. denied*, 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981). McCune and Van Divner maintain that they can establish these requirements because by settling the FELA claims, "MSW expressly or implicitly acknowledged to both trial judges and to McCune and Van Divner its common carrier status upon which the applicability of the FELA depended," [4] and that they relied to their detriment on MSW's representation of itself as a common carrier, and gave up their "right to obtain a judgment against MSW, with the security attendant thereto." Appellees' Brief at 29–31.

Although counsel for McCune and Van Divner alluded to possible equitable reasons for giving them priority status at the July 29, 1985 hearing before the bankruptcy court, the equitable estoppel theory was not fully developed then, and the bankruptcy court did not address the issue. It would be premature for us at this stage of the proceeding, before the bankruptcy court has even determined whether the factual elements of equitable estoppel are present, to foreclose these appellees' claims to some priority treatment. Although we note that McCune and Van Divner will have a difficult burden to prove the kind of detrimental reliance necessary to establish equitable estoppel, we believe that it would be in the best interests of justice to permit this issue to be considered in the first instance by the bankruptcy court. Whether such a claim is legally cognizable may well depend on the factual determination made.

## V.

### CONCLUSION

For the reasons set forth above, we will vacate the district court's stay of bankruptcy proceedings, reverse the district court's

holding that the MSW is a common carrier for purposes of railroad reorganization under Subchapter IV of Chapter 11 of the Bankruptcy Code, and remand this case to the bankruptcy court for further proceedings in accordance with this opinion.

---

**4.** FELA actions may be brought only against railroads who are "common carriers." 45 U.S. C. § 51 (1982).