In re: **PITTSBURGH & LAKE ERIE PROPERTIES, INC.**

**Thomas J. Hileman, Sr.; Leonard Pasinski, Jr., Appellants**

v.

**Pittsburgh & Lake Erie Properties, Inc.**

No. 01–1774.

United States Court of Appeals, Third Circuit.

Argued: March 5, 2002.

Filed: May 14, 2002.

---

Robert L. Potter (Argued), David A. Strassburger, Strassburger McKenna, Gutnick & Potter P.C., Pittsburgh, PA, Counsel for Appellants.

Stephen W. Spence, Phillips, Goldman & Spence, P.A., Wilmington, DE, Counsel for Appellee.

Before: ALITO, RENDELL, and HALL,[1] Circuit Judges.

## OPINION OF THE COURT

HALL, Circuit Judge.

Appellants were injured in the course of their employment on a railroad operated by Appellee and brought suit under the Federal Employers' Liability Act, 45 U.S.C. § 51 et seq. ("FELA"). Appellee subsequently ceased operations as a rail carrier after which it filed for bankruptcy under Chapter 11 of the Bankruptcy Code. Appellants filed proofs of claim against the estate, claiming administrative expense status for their injury awards under 11 U.S.C. § 1171(a). The Bankruptcy Court found Section 1171(a) inapplicable because Appellee ceased being a railroad for the purposes of Section 1171 prior to the bankruptcy petition. The District Court af-

1. The Honorable Cynthia Holcomb Hall, Circuit Judge for the Ninth Circuit, sitting by designation.

firmed. Appellants contend that Section 1171 applies to former railroads disposing of railroad assets and liabilities in bankruptcy as well as entities that operate as railroads on the petition date. We disagree, and affirm the order of the District Court.

## I.

Appellee, Pittsburgh and Lake Erie Properties, Inc. ("P & LE"), is a corporation that historically operated as a rail carrier under the name Pittsburgh and Lake Erie Railroad Company (the "Railroad"). Due to a persistent downturn in rail usage connected with the collapse of the Pittsburgh steel industry, the Railroad decided to cease operations as a carrier in 1990. This was accomplished through a series of transactions closed in 1991 and 1992 in which the Railroad sold its track and rail operations. In 1993, the Railroad also gave up its operating rights to run on specific rail lines under Interstate Commerce Commission ("ICC") regulations and the Interstate Commerce Act. However, P & LE did retain certain rail assets connected with its old operations including real estate, scrap, hoppers, and hopper cars. The parties agree that at the time of the bankruptcy petition, P & LE did not operate as a railroad but did own some rail assets.

Appellants, Thomas J. Hileman Sr. and Leonard Pasinski Jr., are two former Railroad employees who were injured on the job in 1988 and 1991, respectively. Hileman was injured while using a "steam gun" to clean railroad cars. Pasinski was injured while using a defective wrench on railroad tracks. Each filed a FELA action in the Court of Common Pleas of Allegheny County, Pennsylvania, to recover for their injuries. Hileman won a jury verdict of $2.2 million which was subsequently reversed and remanded for a new trial which was stayed by the bankruptcy. During the bankruptcy proceedings the parties stipulated to a claim amount of $1.5 million. Pasinski was awarded $522,500 by a jury.

On March 22, 1996, P & LE filed for chapter 11 protection in the U.S. Bankruptcy Court for the District of Delaware. On or about December 10, 1996, Hileman and Pasinski filed timely proofs of claim against the estate in the bankruptcy court, classifying their claims as having preferred unsecured status. P & LE, meanwhile, classified Appellants' claims in its liquidation plan as general unsecured claims which it expected would be recovered at a rate of about 3%–5% of nominal value. Hileman and Pasinski objected to this liquidation plan, reiterating their position that they are entitled to priority.

In arguing their position to the Bankruptcy Court, Hileman and Pasinski asserted that their claims are preferred because they are entitled to administrative expense status under 11 U.S.C. § 1171(a), which gives priority to claims of individuals with injuries arising out of the operation of the debtor. In response, P & LE argued that Section 1171(a) only applies to cases in which the debtor is an actual railroad on the petition date. P & LE asserted that it was not a railroad on the petition date because it was no longer a common carrier or owner of trackage. The Bankruptcy Court agreed and issued orders confirming P & LE's liquidation plan and classifying Hileman and Pasinski's claims as general unsecured. On appeal, the District Court summarily affirmed the orders of the Bankruptcy Court, finding that the plain language of 11 U.S.C. § 103(h) limits the applicability of Section 1171(a) to debtors that are railroads on the petition date.

## II.

 This court exercises plenary review over the determinations of a district court ruling on appeal from a bankruptcy proceeding such that our task is essentially direct review of the Bankruptcy Court. *In re: Gi Nam*, 273 F.3d 281, 284 (3rd Cir. 2001). We review the District and Bankruptcy Courts' legal rulings de novo. *In re: Top Grade Sausage, Inc.*, 227 F.3d 123, 125 (3d Cir.2000).

 Section 1171(a), the sole basis for Appellants' claim of priority, is located within Subchapter IV of Title 11.[2] The scope of application of that subchapter is defined by 11 U.S.C. § 103(h), which provides, "Subchapter IV of chapter 11 of this title applies only in a case under such chapter concerning a railroad." The term "railroad" is defined in 11 U.S.C. § 101(44) as a "common carrier by railroad engaged in the transportation of individuals or property or owner of trackage facilities leased by such a common carrier." Because P & LE was not a railroad carrier or owner of leased trackage on the petition date, it was not a railroad at that time or during the course of the bankruptcy proceedings.

Hileman and Pasinski nevertheless assert that the District and Bankruptcy Courts erred in refusing to grant them the administrative expense priority provided in 11 U.S.C. § 1171(a). They claim that the plain meaning of Section 103(h), in light of its use of the term "concerning," includes former railroads seeking bankruptcy adjustment of assets and liabilities obtained while they were railroads, as well as entities that actually operated as railroads on the petition date. On their reading, a case unambiguously "concerns" a railroad if it

deals with facts having a historical source in or connection to a railroad even if none of the parties in the case are railroads. They thus argue that we need go no further than the language of Section 103(h) to find that Section 1171(a) is applicable to this case.

We disagree with this reading of Section 103(h), the text of which does not obviously support their interpretation and is at best somewhat ambiguous. Contrary to their attempts to spin the language of Section 103(h) to include former railroads, a natural reading of that section confines the scope of application of Subchapter IV to bankruptcy petitioners who are railroads at the time of petition or thereafter. While Appellants focus on the broad possibilities of the term "concerning," they ignore the fact that this is essentially a connecting term, the scope and meaning of which is defined in part by the terms it modifies. In this case, the connected terms are "case," which is of course a "judicial proceeding for the determination of a controversy between parties wherein rights are enforced or protected, or wrongs are prevented and redressed." *Black's Law Dictionary*, (6th Ed.1990), and "railroad" which is defined in Section 101(44) using the present-tense "engaged." A chapter 11 bankruptcy "case" raised by an entity that has abandoned being engaged in transporting goods and people does not on the most natural reading of this language concern a railroad, it concerns a former railroad. The case can only be said to be "concerning a railroad" in the highly attenuated sense that rights asserted to the bankruptcy court by certain creditors arose from their interaction

---

**2.** Section 1171(a) provides:
There shall be paid as an administrative expense any claim of an individual or of the personal representative of a deceased individual against the debtor or the estate, for

personal injury to or death of such individual arising out of the operation of the debtor or the estate, whether such claim arose before or after the commencement of the case.

with what was at that time a carrier engaged in rail transportation.

Moreover, if the language of Section 103 seen in isolation may leave some doubt as to its meaning, any ambiguity permitting the reading urged by Appellants is removed by the terms and structure of Subchapter IV. *See Nelson v. American Dredging Co.*, 143 F.3d 789, 797 (3rd Cir. 1998) (the plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole). When a debtor petitions for bankruptcy in a case concerning a railroad, Subchapter IV provides special rules and procedural machinery which protect the public interest in the availability and continuation of rail travel and deal with other special problems in reorganizing or dissolving a railroad. For example, Section 1163 makes appointment of a bankruptcy trustee nominated by the Secretary of Transportation mandatory, while Section 1165 requires the bankruptcy court and trustee to consider the public interest in all actions. 11 U.S.C. §§ 1163, 1165. Section 1170 permits a court to authorize abandonment of a railroad line only if doing so is consistent with that interest. 11 U.S.C. § 1170(a)(2). Similarly, various sections of Subchapter IV reserve roles for the Secretary of Transportation, the ICC, and local regulators in the bankruptcy process, while others concern issues such as the handling of rolling stock equipment and the effect of rejection of leases of a railroad line. *See* 11 U.S.C. §§ 1163, 1164, 1166, 1168, 1169, 1170, 1172. These provisions function as an integrated scheme of procedural safeguards which are appropriate to and assume that the debtor is a railroad engaged in the transportation of persons or property. The design of Subchapter IV to protect the public interest in the provision of rail transportation thus manifests a Congressional intent that Section 103(h) be applied to require application of this statutory scheme in cases where it would be appropriate, i.e. when the debtor is a railroad or owner of trackage whose disposition of assets or reorganization could affect the public interest.

Conversely, the need for the procedural machinery created by this statutory scheme is not implicated in the case of a debtor that has already abandoned its rail operations. In addition to the fact that it no longer has its own rail operations to be protected, such a debtor, if formerly subject to national regulation, has already undergone a process of asset disposal subject to ICC approval. 49 U.S.C. § 10903 gives the ICC the power to directly regulate the abandonment or discontinuation of rail lines or service outside of bankruptcy. It also has the power under 49 U.S.C. § 10909 to control the disposal of individual rail properties during an abandonment when such properties are "suitable for public use." An entity such as P & LE that has abandoned operations as a railroad has thus already had properties that federal regulators consider important to the public interest disposed of in accordance with that interest. An interpretation of the scope of Section 103(h) that would include former railroads such as P & LE would nonsensically require the use of the costly extra machinery of Subchapter IV where such expenditure has no justification.

Although we need go no further than the text of Section 103(h) together with the text and structure of Subchapter IV in order to determine the former's meaning, we also note that the legislative history and our prior caselaw are both consistent with this reading. The Senate Report accompanying the 1978 Bankruptcy Reform Act states that Section 103 refers to the special rules for "railroad reorganizations,"

suggesting its scope is limited to petitioners who are railroads. S. Rep. 95–989, *28 *reported in* 1978 U.S.C.C.A.N. 5787. The report also emphasizes that the basic purpose of Subchapter IV taken as a whole is to create enhanced procedural safeguards to protect the public interest in the availability and continuation of rail transportation. *See id.* at *12, *133. There is no indication that Congress intended Subchapter IV to be applied in cases other than those involving railroad reorganizations.

As for prior caselaw, the only case decided by this Court which speaks to analogous facts also supports this reading. In *Wheeling–Pittsburgh Steel Corp.* v. McCune, 836 F.2d 153 (3rd Cir.1987), the issue was whether Subchapter IV bankruptcy requirements, including both appointment of a trustee and application of Section 1171, applied to a small intrastate railroad that did not in fact act as a common carrier serving the public, but which technically retained a state "certificate of public convenience" designating it a common carrier. In that case, the debtor had historically been chartered as a railroad for public use but had at least since 1980 served only to haul materials locally for its parent company. *Id.* at 156. At the time of the bankruptcy petition, the railroad's application to the state for a certificate authorizing it to abandon certain tracks and cease operations as a common carrier was before the Pennsylvania Supreme Court. *Id.* at 157. Shortly thereafter, the state court affirmed an order to grant the application on the basis that the railroad was no longer a common carrier. *Id.* At the time of the bankruptcy proceeding, the Pennsylvania Supreme Court had ruled, though the railroad technically remained

certified pending the resolution of related proceedings before the Pennsylvania Public Utilities Commission. *Id.*

Against this background, this Circuit held that it was error for the district court to find that the debtor was a railroad and stay the bankruptcy proceedings rather than allow them to proceed under the chapter 11 procedures for non-railroads. The Court noted that the "essance of common carrier status is service of the public trust" and found:

> in light of the failure of the parties to adduce any evidence to the bankruptcy court on the issue of[the bankrupt's] status as a common carrier other than that summarized in the decisions of the [Pennsylvania Public Utilities Commission] and the Pennsylvania courts, the bankruptcy court's finding that [the debtor] is not a common carrier was not clearly erroneous. There was absolutely no evidence that it offered its services to the public generally. We have already explained that the bankruptcy court did not err as a matter of law in refusing to base its decision on the outstanding state certificate, in light of the Pennsylvania Supreme Court decision. It follows that the district court erred in staying the bankruptcy proceedings in order to await the conclusion of the[the Public Utilities Commission's] decision.

*Id.* at 161. The Court thus determined that Subchapter IV did not apply to a debtor who was not at the time a common carrier. It made this determination without regard to the possibility that the debtor may have been a railroad prior to the bankruptcy petition or the fact that it retained assets that had been used in rail operations.[3]

---

**3.** Appellants claim that *Wheeling–Pittsburgh* is distinguishable because it did not specifically set out the test for Section 103 as whether the

debtor is a common carrier on the petition date. The facts of that case do suggest that the debtor might not have been a common

Finally, Appellants also argue that denying employees the protection of Section 1171 under circumstances such as these will create the potential for debtors and creditors to collude to the detriment of employees by deliberately taking a debtor out of the railroad business before declaring bankruptcy. This, they point out, would frustrate Congress' intent to ensure that injured railroad workers receive preferred status so that railroads will bear the risk of workers injured on the job. While we recognize that this argument does have some force, we are constrained to conclude that it is directed at the wrong place. It is Congress that chose to tie the protections of Section 1171 to the bankruptcy machinery reserved for the reorganization or dissolution of current rather than former railroads, and we are not empowered to undo that decision.

### III.

The amended order of the District Court affirming the Bankruptcy Court's orders classifying Appellants' claims as general unsecured claims and confirming Debtor's plan of liquidation is AFFIRMED.

carrier for purposes of the bankruptcy code for quite a long time prior to the petition date. However, the language of the decision indicates that the court would normally have pre-

sumed that the railroad was a common carrier based on the state certificate. *Id.* at 160.