In re BRANIFF, INC., Debtor.

BRANIFF, INC., Plaintiff,

v.

James W. TOREN, etc., et al.,
Defendants.

Bankruptcy No. 89–03325–BKC–6C1.
Adv. No. 89–0346.

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

Feb. 21, 1990.

David R. McFarlin of Akerman, Senterfitt & Eidson, Orlando, Fla., for plaintiff.

Stephen E. Herrmann and William J. Wade, of Richards, Layton & Finger, Wilmington, Del., Co–Counsel for plaintiff.

Howard T. Glassman, Joel C. Shapiro, Faith R. Greenfield, Earl M. Forte, III, and Gregg A. Parker of Blank, Rome, Cominsky & McCauley, Philadelphia, Pa., for defendant.

Harry D. Lewis of Milgram, Thomajan & Lee, Orlando, Fla., for the Official Committee of Unsecured Creditors.

David Levine of Tew, Jorden, Shulte & Beasley, Miami, Fla., for the Official Committee of Noteholders.

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

C. TIMOTHY CORCORAN, III, Bankruptcy Judge.

This adversary proceeding came on for hearing on January 22, 1990, of the motion for summary judgment (Document No. 6) filed by plaintiff, Braniff, Inc. ("Braniff"), and the motion for summary judgment (Document No. 9) filed by defendants, James W. Toren and Wilmington Trust Company, as trustees of the BRNF Liquidating Trust ("BRNF").

Braniff filed its complaint in this adversary proceeding seeking a declaratory judgment that the lease of certain Boeing 727 aircraft between Braniff, as lessee, and BRNF, as lessor, is not subject to Section 1110 of the Bankruptcy Code, 11 U.S.C. § 1110. Among other things, Section 1110 gives certain benefits to an aircraft owner who leases aircraft and related equipment to an air carrier who later ends up as a debtor in a Chapter 11 case. The benefits are an overriding of the automatic stay or any other power of the Court to enjoin the lessor from repossessing the aircraft unless the debtor agrees to perform and cure all prior defaults within 60 days of the order for relief.

Braniff contends that Section 1110 of the Bankruptcy Code applies only to aircraft and equipment that are newly acquired by an air carrier lessee. Braniff further contends that the lease at issue here did not enable it to acquire aircraft new to it. Instead, Braniff contends, the lease merely permitted the implementation of the plan of reorganization of Braniff Airways, Incorporated ("Airways"); that Braniff continued the scheduled air operations of Airways as part of that reorganization; and that the lease simply permitted Braniff to use the Airways aircraft in the continuation of air operations in implementation of Airways' plan. In other words, Braniff contends, the lease was a vehicle to refinance the assets of the old Braniff Airways, not a device to permit Braniff to acquire the aircraft. In that sense, Braniff argues, the aircraft subject to the lease were not new to Braniff and therefore Section 1110 does not apply to the lease. It seeks a declaratory judgment so stating.

In addition to raising certain affirmative defenses, BRNF basically contends that the provisions of Section 1110, on their face, apply to this lease and that it is entitled to a declaratory judgment so stating.

The parties have filed cross motions for summary judgment, have filed briefs, and have offered oral argument. Accordingly, the Court finds the following undisputed material facts and reaches the following conclusions of law:

### Undisputed Facts

On May 13, 1982, Braniff Airways, Incorporated ("Airways"), filed a petition for reorganization under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas. At that time, Airways was an air carrier operating under the Braniff trade name. In due course, Airways filed in that case its Disclosure Statement and Plan ("Plan") dated July 15, 1983. On September 1, 1983, the Texas Bankruptcy Court entered its order confirming the Plan.

As part of the Plan, a liquidating trust, BRNF, was established by Airways to distribute funds to certain of its creditors. Braniff was also created as a subsidiary of Airways to operate a scheduled domestic airline route system under the Braniff trade name. Further pursuant to the Plan, Airways transferred the aircraft at issue here to BRNF, and BRNF and Braniff en-

tered into a lease of the aircraft dated as of December 15, 1983 (the "Lease").

Pursuant to the Lease, BRNF leased 30 Boeing 727–200 aircraft and other property to Braniff (the "Leased Property"). At all times material, Braniff was an air carrier operating under a certificate of convenience and necessity issued by the Civil Aeronautics Board. The Leased Property consists of aircraft, aircraft engines, appliances, or spare parts as defined in Section 101 of the Federal Aviation Act of 1958, 49 U.S.C.App. § 1301. In addition, under the Lease, BRNF has the right to take possession of the Leased Property in the event of default by Braniff.

Braniff filed its voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code in this Court on September 28, 1989. No monetary obligations were then due by Braniff to BRNF under the Lease. On December 1, 1989, plus an additional 10–day grace period, however, Braniff became obligated to make payments under the Lease in an amount in excess of $5.5 million for the quarter ended December 1, 1989. To date, none of those payments have been made.

### Conclusions of Law

This Court has jurisdiction of the parties and the subject matter pursuant to the Bankruptcy Code, 11 U.S.C. §§ 101 et seq., 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and the standing order of reference entered by the District Court. This is a core proceeding within the meaning of 28 U.S.C. § 157(b) and is governed by Part VII of the Bankruptcy Rules.

The parties have an actual controversy as to the applicability of Section 1110 to the Lease. Accordingly, this Court may find and declare the rights and other legal relations of the parties pursuant to 28 U.S.C. § 2201.

Each of the elements set forth in Section 1110 of the Bankruptcy Code is satisfied on the facts of this case. There is a (i) lessor (ii) of property of the required type (iii) that has been leased to an air carrier debtor of the requisite type, and (iv) the terms of the Lease provide for the lessor to take posses-

sion of the property upon default. On its face, therefore, Section 1110 applies to the Lease. Braniff acknowledges this obvious point.

Despite this plain reading of the statute, Braniff contends that Section 1110 does not apply to this lease. Braniff argues that the legislative history shows that Congress intended the statute to apply only in circumstances where a lessor leases new aircraft and related equipment to an airline; in other words, where the lease facilitates the acquisition of the aircraft. Although Braniff concedes that the aircraft and equipment may be used rather than newly manufactured, its point is that the aircraft must be *new to the airline* to satisfy the Congressional intent.

Braniff argues further that the aircraft and equipment subject to the Lease are not at all new to Braniff because these planes have simply continued their service under the Braniff trade name as part of the implementation of Airways' Plan. In other words, the Lease facilitated the Airways reorganization and the continuation of air service formerly provided by Airways and was an integral part of the refinancing of the Airways assets; it did not allow Braniff to acquire the aircraft. According to Braniff, this is significant—and controlling—because Section 1110 was designed by Congress to encourage the availability of new capital equipment to airlines at costs less than would otherwise be required to be charged. Section 1110 achieves this purpose by protecting a lessor of certain kinds of very expensive capital equipment from risks that would otherwise be associated with the filing for bankruptcy protection of the air carrier lessee and the resulting application of the automatic stay. Section 1110 was not designed by Congress to facilitate the reorganization of a debtor airline. Thus, Braniff urges, giving BRNF the benefits of Section 1110 here results in a perversion of the statute and the Congressional purpose in enacting it.

The threshold issue presented by Braniff's contention is the proper construction of Section 1110 considered in conjunction with the relevant legislative history. The

language of Section 1110 is clear and unambiguous; according to the statute, the benefits that Section 1110 provides are applicable when the enumerated, plainly stated elements are present and satisfied, as they obviously have been satisfied here. Ordinarily, it would not be necessary to go beyond the face of the statute to look for additional requirements. *Solis–Ramirez v. United States,* 758 F.2d 1426, 1430 (11th Cir.1985) (review of legislative history not necessary unless statute is inescapably ambiguous).

▮▮▮ Braniff asserts, however, that, despite the face of the statute, the legislative history demonstrates that Congress intended to limit the scope of Section 1110 to acquisition leases. Clearly, a court must construe a federal statute in such a way that effectuates, rather than frustrates, the legislative purpose. *Aranda v. Pena,* 413 F.Supp. 849, 850 (S.D.Fla.1976). The statutory language will control, however, unless the express legislative intent clearly contradicts the statutory language. *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) (absent clearly expressed contrary legislative intent, statutory language must ordinarily be regarded as conclusive); *Braunstein v. Commissioner,* 374 U.S. 65, 70, 83 S.Ct. 1663, 1666, 10 L.Ed.2d 757 (1965) (nothing contained in language or structure of statute to demand or justify the reading in of additional requirements).

▮▮▮ As these principles require, the Court has reviewed the relevant legislative history to determine whether Congress, in fact, expressed an intent to limit Section 1110 protection to acquisition leases. This history reveals that owners of aircraft were initially given protection of the sort provided now by Section 1110 in 1957. Bankruptcy Act § 116(5) (added by Pub.L. No. 85–295, c. 681, 71 Stat. 617 (1957)). Before then, protections of this sort were available only to owners of railroad rolling stock. When aircraft owners were added in 1957, the protection they were given by the predecessor of Section 1110 was *limited* to transactions involving leases and con-

ditional sales. It was not until the adoption of the Bankruptcy Code in 1978 that these protections were *expanded,* under Section 1110, expressly to include certain purchase money financing transactions. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 239–40, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6198–200.

In making its argument, Braniff relies on language in the legislative history of this 1978 expansion into the area of purchase money financing to find support for the proposition that the Congress intended that a lease provide for a new acquisition to entitle the lessor to Section 1110 protection. To be sure, new acquisitions are an integral part of purchase money financing. It is not surprising, therefore, that references to new acquisitions were featured prominently in the Congressional debates and reports constituting the legislative history of the 1978 expansion. But focusing on the 1978 legislative history that discusses the purposes for a particular expansion of the statute without also examining the earlier base from which the expansion was being made distorts the conclusion.

In the legislative history before the 1978 expansion into purchase money financing, there appears no support for the proposition that new acquisitions were intended to underlie, and be a necessary prerequisite for, the protections afforded to lessors by Section 1110's predecessors. On the contrary, the House Report recommending the 1957 expansion, which first included the aircraft industry, specifically states that its purpose was to permit a lessor or conditional seller to immunize his title and right to repossession from the provisions of Chapter X of the Bankruptcy Act. *See* H.R. Rep. No. 944, 85th Cong., 1st Sess., *reprinted in* 1957 U.S.Code Cong. & Ad. News 1926. The Report then went on to state that "[m]any of the Nation's smaller airlines are today facing serious financing problems resulting from the need to replace obsolete equipment with modern aircraft." *Id.* It continued:

> Testimony also indicated that the enactment of this bill would result in an increased availability of capital and at a

lower interest rate than would be demanded under present conditions. The reason for this is the greater security afforded conditional sales vendors and lessors by the amendment to chapter X made in this bill.

*Id.*

Although the Congress was obviously acting in front of a backdrop that included the airline industry's need to acquire replacement aircraft, it placed nothing in the bill or in the report suggesting that the benefits afforded by the bill would be limited to lessors of acquisition leases. This is significant because the stated purpose of the bill—protecting lessors and conditional sellers—facilitates the reduction of capital costs to an airline regardless of whether the transaction contemplates the acquisition of new equipment (by a new lease, for example) or the refinancing of existing equipment (by the renewal of an existing lease, for example).

That purpose is reiterated in the legislative history relating to the proposed Section 1110. The 1977 House Report refers to the then present law applicable to leases and conditional sales, noting that the theory behind the protection then afforded in those transactions was that title to the property remained in the financier and did not pass to the debtor. H.R.Rep. No. 595, 95th Cong., 1st Sess. 239–40, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6198–99. Later in the same report, in contrast, the legislators acknowledged the changes in financing practices brought about by the adoption of Article 9 of the Uniform Commercial Code. *Id.* at 240, 1978 U.S.Code Cong. & Ad.News at 6199. Under the new Article 9, of course, a seller receiving a security interest did not retain title to the goods, and Section 1110's predecessor therefore was not available to protect him.

Because of this gap, the legislators advocated the expansion of the protection to holders of Article 9 security interests, specifically stating that equipment security interests included only security interests granted to finance the acquisition of covered equipment; they did not include general mortgages. *Id.* The Congress then followed suit by drafting the language of the statute itself, specifically using the words "a secured party with a purchase-money equipment security interest" to express the concept. Whatever the Congress intended regarding security interests, nothing suggests that Congress intended to change the law that had then existed for some 20 years regarding lease transactions.

This conclusion is further buttressed by the report's declaration that, although the bill added protection for holders of security interests given in connection with the acquisition of covered equipment, otherwise "[a]n attempt was made to preserve the limitations on the right of the financer contained in current law." *Id.* Under the then current law, of course, the "financer" was a lessor or a conditional seller; if a lessor, the then current law imposed no limitations requiring that the lease be an acquisition lease.

Looking at the legislative history as a whole, therefore, there is clear support for the proposition that only security interests given in purchase and sale transactions qualify for Section 1110 treatment, just as the plain language of the statute says.[1] As to leases, however, there is little, other than possibly an analogy to Article 9 security interests, to suggest that Congress intended to include in Section 1110 an additional requirement—that a lease must be an acquisition lease—in order to bring it within the protection provided by the Section. Certainly the history provides no express legislative intent that is contrary to the plain language of the statute, · which omits any "acquisition" element for leases, that would justify the Court's inclusion of this additional requirement. *See* Gerstell

---

1. It is noteworthy that Section 1110 specifically applies to a "secured party with a purchase-money equipment security interest" in covered equipment. In the case of holders of security interests, therefore, the language of the statute itself provides the required "acquisition" element. The legislative history is consistent with the presence of this requirement and the Congress' intent that it be there. In the case of a "lessor" of covered equipment, however, the language of the statute imposes no similar "acquisition" requirement.

& Hoff–Patrinor, "Aviation Financing Problems Under Section 1110 of the Bankruptcy Code," 61 *Am.Bankr.L.J.* 1 (1987); *but cf.* Goldman, Album & Ward, "Repossessing the Spirit of St. Louis: Expanding the Protections of Section 1110 and 1168 of the Bankruptcy Code," 41 *Bus.Law.* 29, 38 (1985). The Court, therefore, concludes that it must apply the statutory language as written: Section 1110 is not limited to leases that permit aircraft to be newly acquired by the lessee.

Even if the requirement that Braniff contends should be read into the statute is placed there, the Court concludes that Section 1110 would still apply to this Lease. As of December 15, 1983, the time the Lease was made, Braniff was a newly formed, organized, capitalized, and certified air carrier that was about to begin scheduled operations. Although it was organized as part of the reorganization of Airways, was an Airways subsidiary, and used the same trade name that Airways had used before, Braniff was a new legal entity beginning a new business. As such, the Leased Property acquired pursuant to the Lease from BRNF was new to Braniff. Indeed, the benefits provided by Section 1110 to lessors helped it acquire the Leased Property. These benefits obviously encouraged BRNF to make the Lease of the Leased Property to the new, fledgling airline by minimizing some of BRNF's risk. This is completely consistent with the proposition that the extension by the Congress of benefits of this type to owners of aircraft equipment in 1957 was "to encourage new financing in the transportation industry and to promote organization of the industry by protecting equipment financiers." Gerstell & Hoff–Patrinos, *supra* at 7.

For these reasons, the Court can find no suggestion in the language of Section 1110 or its legislative history that Section 1110 does not apply to a lessor that is a liquidating trust in the reorganization of a prior debtor, at least in circumstances where the liquidating trust leased the aircraft and equipment of the old debtor to a new entity beginning an air carrier operation under the trade name of the old debtor.

In view of the Court's conclusions, the Court makes no determination of the matters asserted by BRNF as affirmative defenses.[2]

Being fully advised, therefore, the Court concludes that the pleadings, admissions, and affidavits on file show that there is no genuine issue as to any material fact and that BRNF is entitled to a declaratory judgment in its favor as a matter of law. For the reasons set forth here, the Court therefore grants BRNF's motion for summary judgment and denies Braniff's motion for summary judgment. BRNF is entitled to a declaratory judgment that Section 1110 applies to the Lease.

Pursuant to Bankruptcy Rule 9021, the Court has entered a separate judgment based upon the decision contained in this order.[3]

DONE and ORDERED.

2. In general, BRNF asserts that res judicata and collateral estoppel bind Braniff in the applicability of Section 1110 to this Lease because the Airways Plan and the Texas Bankruptcy Court's order of confirmation contained provisions stating that Section 1110 applied to this Lease.

3. The Court announced its decision at the hearing on January 22, 1990. On February 1, 1990, the Court entered a Preliminary Order on Cross Motions for Summary Judgment (Document No. 15), adopting the oral statements made at the hearing as the Court's decision and preliminary findings and conclusions. In the preliminary order, the Court further found that BRNF would suffer monetary loss and Braniff would be exposed to an increased administrative claim if the Court delayed entry of judgment pending the completion of the Court's final order. Accordingly, the Court also entered judgment on February 1, 1990 (Document No. 16). This order supercedes the preliminary order as the Court's decision, findings, and conclusions.