In re CONTINENTAL AIRLINES,
INC., et al., Debtors,

Continental Airlines, Inc., et
al., Appellants.

No. 91–3204.

United States Court of Appeals,
Third Circuit.

Argued May 1, 1991.

Decided May 9, 1991.

As Amended May 30, 1991.

Zack A. Clement (argued), Fulbright & Jaworski, Houston, Tex., James L. Patton, Jr., William D. Johnston, Young, Conaway, Stargatt & Taylor, Wilmington, Del., for appellants Continental Airlines, Inc., et al.

Thomas L. Ambro (argued), Allen M. Terrell, Jr., Richards, Layton and Finger, Wilmington, Del., for appellees First Sec. Bank of Utah, et al.

Marc Abrams (argued), Willkie, Farr and Gallagher, New York City, Henry E. Gallagher, Jr., Connolly, Bove, Lodge & Hutz, Wilmington, Del., for appellee Whirlpool Financial Corp.

Anne B. Horgan, Lassen, Smith, Katzenstein & Furlow, Wilmington, Del., for appellees Aviation Sales Co., et al.

Anthony W. Clark, Skadden, Arps, Slate, Meagher & Flom, Wilmington, Del., for appellees Polaris Aircraft Income Funds III & IV, et al.

Craig R. Parker, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for appellee Bank of America Nat. Trust & Sav. Ass'n.

Richard G. Elliott, Jr., Richards, Layton and Finger, Wilmington, Del., for appellees Potomac Capital Investment Corp., et al.

Lynn T. Kanaga, Wilmington, Del., for appellees Progress Credit Corp., et al.

Lawrence C. Ashby, James McC. Geddes, Ashby, McKelvie & Geddes, Wilmington, Del., for appellees PLM Intern., Inc., et al.

Victor F. Battaglia, Biggs and Battaglia, Wilmington, Del., for appellee MNC Leasing.

Richard G. Elliott, Jr., Richards, Layton and Finger, Wilmington, Del., William C. Clarke, William R. Brennan, Lord Day & Lord, Barrett Smith, New York City, for amici curiae, America West Airlines, Inc., American Airlines, Inc., Northwest Airlines, Inc., United Air Lines, Inc., and USAir, Inc., on behalf of appellees.

Bennett Boskey, Volpe, Boskey and Lyons, Washington, D.C., for amicus curiae, American Association of Equipment Lessors, on behalf of appellees.

Before BECKER, STAPLETON and SCIRICA, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

Continental Airlines, Inc. and related corporations (collectively "Continental"), debtors-in-possession, appeal from a judgment of the district court. The district court ruled that aircraft held under bona fide leases, even though structured as sale-leasebacks, are exempt from the automatic stay in bankruptcy pursuant to 11 U.S.C. § 1110, and therefore are subject to repossession. We stayed the district court's order pending an expedited appeal and will now affirm.

### I.

On December 3, 1990, Continental filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. This appeal concerns the treatment under the Code of various aircraft leased to Continental. Ordinarily, property in the debtor's possession, including leased property, is subject to the automatic stay in bankruptcy, which prevents any entity from removing that property to satisfy claims against the debtor. *See* 11 U.S.C. § 362 (1988). However, under 11 U.S.C. § 1110, certain property in the possession of airlines is exempt from the automatic stay. On January 16, 1991, Continental filed a motion before the bankruptcy court seeking a dec-

laration that certain aircraft leased to it were not subject to § 1110. This motion was opposed by the lessors of the aircraft. The bankruptcy court granted Continental's motion on January 30. 123 B.R. 713. On March 26, the district court reversed the bankruptcy court's order. *See In re Continental Airlines, Inc.,* 125 B.R. 399 (D.Del.1991). This appeal followed.

This case turns exclusively on the interpretation of § 1110. That section provides in part that:

(a) *The right of* a secured party with a purchase-money equipment security interest in, or of *a lessor* or conditional vendor *of,* whether as trustee or otherwise, *aircraft,* aircraft engines, propellers, appliances, or spare parts ... *that are* subject to a purchase-money equipment security interest granted by, *leased to,* or conditionally sold to, *a debtor that is an air carrier ...,* to take possession of such equipment in compliance with the provisions of a purchase-money equipment security agreement, *lease,* or conditional sale contract, as the case may be, *is not affected by section 362 or 363 of this title or by any power of the court to enjoin such taking of possession,* unless—

(1) before 60 days after the date of the order for relief under this chapter, the trustee, subject to the court's approval, agrees to perform all obligations of the debtor that become due on or after such date under such security agreement, lease, or conditional sale contract, as the case may be; and

(2) any default, other than a default of a kind specified in section 365(b)(2) of this title, under such security agreement, lease, or conditional sale, as the case may be—

(A) that occurred before such date is cured before the expiration of such 60–day period; and

(B) that occurs after such date is cured before the later of—

(i) 30 days after the date of such default; and

(ii) the expiration of such 60–day period.

11 U.S.C. § 1110 (1988). (emphasis added). Thus, on its face this section permits a "lessor of aircraft that are leased to a debtor that is an air carrier" to repossess those aircraft, notwithstanding the automatic stay provisions, unless the debtor cures its defaults within a specified time period.

As is customary in the commercial airline industry, Continental leases a large percentage of its aircraft. Approximately two thirds of Continental's current fleet consists of leased aircraft. These leases are of two types. Some are what Continental terms "acquisition" leases, under which it has acquired aircraft to augment its fleet, usually through standard lease arrangements. According to Continental, 211 of its aircraft are operating under acquisition leases. Others are "non-acquisition" leases, under which Continental has sold aircraft from its existing fleet and leased the same aircraft back from the purchaser. These sale-leaseback transactions are widely used in the airline industry as a means of raising working capital. According to Continental, 104 of its aircraft are operating under non-acquisition leases.[1] Aircraft lessors typically "leverage" their leases by borrowing all or part of the purchase price, secured by the lessor's rights under the lease.

In addition to providing general capital, aircraft sale-leasebacks are employed for other reasons. Some new aircraft are financed through package deals, under which an airline purchases aircraft from a manufacturer and then executes a sale-leaseback with a financier. Continental categorizes these transactions as acquisition leases, because they result in the addition of aircraft to the fleet. However, because the rental price is affected by interest rates and other timing considerations, sale-leaseback transactions are often delayed until some time after delivery of the new aircraft. In another variant, older aircraft scheduled for retirement from the fleet are

---

**1.** Subsequent to the district court's ruling, Continental reached agreements covering 57 of these aircraft, under which Continental will defer rental payments until September, 1991.

sold when market conditions are propitious, and then leased back from the buyer until the retirement date. The buyer then re-sells the plane in the used aircraft market.

It is Continental's position that § 1110 was intended to apply only to leases which result in aircraft that are new to an air-line's fleet, and not to non-acquisition leas-es. Continental contends that the term "lease" should be read in context with the other interests exempted under § 1110—the "purchase money equipment security interest" and the "conditional sale"—which are acquisition devices. Con-tinental cites to legislative history which it contends demonstrates Congress' intent to limit the § 1110 exemption to acquisition financing transactions.

The lessors maintain that the term "lease" plainly refers to any lease, whether acquisition or non-acquisition, and that the legislative history is insufficient to over-come that plain meaning. The lessors are supported in this appeal by several solvent airlines as *Amici,* who contend that accept-ance of Continental's position would hinder financing prospects for the entire industry. Continental has made "cure" payments un-der its acquisition leases, but has made no payments under its non-acquisition leases.

The bankruptcy court agreed with Conti-nental, holding that § 1110 was intended to apply only to acquisition leases. It held that Continental's sale-leasebacks were not covered by § 1110, and thus were subject to the automatic stay, unless those leases were part of a "package deal" under which aircraft were newly procured for the fleet. The district court reversed, holding that § 1110 was intended to exempt both acqui-sition and non-acquisition leases.

Before the bankruptcy court, Continental also made the separate argument that not-withstanding whether § 1110 covers non-acquisition leases, it was intended to apply only to "true" leases. Under this interpre-tation, Congress intended that § 1110 fol-low the Uniform Commercial Code, which treats certain transactions denominated as leases as disguised security interests. *See* U.C.C. § 1–201(37) (1987). Continental maintains that certain of its leases are not "true" leases, but are in fact disguised security interests not otherwise covered un-der § 1110. Neither the bankruptcy court nor the district court reached this issue. We hold that § 1110 covers only true leas-es, but are not presented with the question of whether any of Continental's leases fail to qualify. Continental has reserved this "characterization" issue, which may in-volve litigation over the specific nature of each lease. We express no opinion on the proper forum for the litigation of this is-sue, should it arise.

## II.

■ We have an independent obli-gation to ascertain our own jurisdiction. *See, e.g., In re Brown,* 803 F.2d 120, 121 n. 2 (3d Cir.1986). We have jurisdiction only over final orders of the district court. *See* 28 U.S.C. § 158(d) (1988). The order of the bankruptcy court declared that certain air-craft were not subject to § 1110 and could not be repossessed. We believe this order was final. In the bankruptcy context, we have adopted a pragmatic view of the final-ity requirement, treating orders as final that in other contexts might be considered non-final. *See, e.g., Walsh Trucking Co. v. Insurance Co. of North America,* 838 F.2d 698, 701 (3d Cir.1988). We look to various factors, including the impact of the issue on the assets of the bankruptcy estate, the necessity for additional fact-finding on re-mand, the preclusive effect of a decision on the merits, and furtherance of judicial econ-omy. *See Wheeling–Pittsburgh Steel Corp. v. McCune,* 836 F.2d 153, 158 (3d Cir.1987). The bankruptcy court's ruling deprived the lessors of the ability to repos-sess their aircraft or force rental pay-ments, and therefore was final. *See Unit-ed States v. Nicolet, Inc,* 857 F.2d 202, 206 (3d Cir.1988) (order denying relief from au-tomatic stay is generally appealable). Be-cause § 1110 was designed to ensure an expedited remedy for holders of protected interests, it is important to permit prompt appeals of orders denying relief under that section.

■ However, this appeal is from the order of the district court, which reversed

the ruling of the bankruptcy court and held that § 1110 applies to all "bona fide" leases. The district court did not reach the characterization issue, which may still need to be decided by a court of competent jurisdiction. If the district court had issued a ruling that a particular plane was subject to repossession under § 1110, that order would certainly be final. *See In re Comer*, 716 F.2d 168 (3d Cir.1983) (order lifting automatic stay and subjecting property to foreclosure held appealable). But the finality analysis is complicated by the fact that the characterization issue may need to be decided in the future. Ordinarily, the prospect of further fact-finding on remand would weigh against a determination that a particular order is final.

However, in *In re Marin Motor Oil, Inc.*, 689 F.2d 445 (3d Cir.1982), *cert. denied*, 459 U.S. 1206, 103 S.Ct. 1196, 75 L.Ed.2d 440 (1983), we held that "when the bankruptcy court issues what is indisputably a final order, and the district court issues an order affirming or reversing, the district court's order is also a final order...." *Id.* at 449. In that case, the bankruptcy court had issued an order denying intervention, and the district court had reversed. We noted the traditional rule that orders denying intervention are appealable, but orders granting intervention are not. We held that the traditional rule did not apply in bankruptcy, and we assumed jurisdiction over the district court's grant of intervention because the original order of the bankruptcy court had been final.

We have noted that *Marin Motor Oil* "stand[s] for the proposition that this court must consider finality functionally in bankruptcy cases" and its holding is properly invoked "where the issue is likely to affect the distribution of the debtor's assets, or the relationship among the creditors." *In re Brown*, 803 F.2d 120, 122 (3d Cir.1986). We believe the rule applies in this case. Consequently, we have jurisdiction because the order of the bankruptcy court was final, regardless of whether the district court's order would otherwise have been considered final. *Cf. New Castle County v. Hartford Accident and Indemnity Co.*, 933 F.2d 1162, 1180 (3d Cir.1991) (once district court order is final and properly on appeal, subsequent order of appellate court cannot render it non-final). We note that the Court of Appeals for the Second Circuit assumed jurisdiction over an identical dispute, notwithstanding that the characterization issue also remained in that case. *See In re Pan Am Corp.*, 929 F.2d 109 (2d Cir.1991) (per curiam), *aff'g* 125 B.R. 372 (S.D.N.Y.1991).[2]

### III.

This appeal involves a straightforward question of statutory interpretation, albeit one of great importance to the parties. Put simply, we must determine whether the word "lease" in § 1110 was

---

**2.** We recognize that the majority of Courts of Appeals do not follow the *Marin Motor Oil* approach. The majority rule is that any district court order that has the effect of remanding a matter to the bankruptcy court is not appealable unless only "ministerial" acts remain to be performed by the bankruptcy court. *See, e.g., In re St. Charles Preservation Investors, Ltd.*, 916 F.2d 727, 729 (D.C.Cir.1990) (per curiam); *In re Gould & Eberhardt Gear Machinery Corp.*, 852 F.2d 26, 28–29 (1st Cir.1988); *In re Miscott Corp.*, 848 F.2d 1190, 1192 (11th Cir.1988); *Bowers v. Connecticut Nat'l Bank*, 847 F.2d 1019, 1023 (2d Cir.1988); *In re County Management, Inc.*, 788 F.2d 311, 314 n. 4 (5th Cir.1986). *In re Commercial Contractors, Inc.*, 771 F.2d 1373 (10th Cir.1985); *In re Riggsby*, 745 F.2d 1153 (7th Cir.1984). *But see In re Gardner*, 810 F.2d 87, 90–92 (6th Cir.1987) (following *Marin Motor Oil* approach). The Eighth and Ninth Circuits apparently suffer from intracircuit splits on the issue. *Compare In re Bestmann*, 720 F.2d 484, 486 (8th Cir.1983) *and In re Sambo's*, 754 F.2d 811, 814 (9th Cir.1985) (following *Marin Motor Oil* approach) *with In re Vekco, Inc.*, 792 F.2d 744 (8th Cir.1986) *and In re Martinez*, 721 F.2d 262, 265 (9th Cir.1983) (following majority approach).

The remaining characterization issue is more than "ministerial." The entire matter could be appealed as soon as one lease is finally declared to be subject to § 1110. *See, e.g., In re Bacchus*, 718 F.2d 736 (5th Cir.1983) (district court ruling that certain property was "homestead" property was non-final, because an exemption could not be granted until it was determined whether the owner had intended to abandon the property). However, *Marin Motor Oil* remains the law of this circuit and we are bound to follow it.

intended to apply only to acquisition leases. We note at the outset that we do not write on a blank slate. The "identical" question has been considered in two other cases, where the position now taken by Continental has been rejected. *See In re Pan Am Corp.*, 929 F.2d 109 (2d Cir.1991) (per curiam), *aff'g* 125 B.R. 372 (S.D.N.Y.1991); *In re Braniff, Inc.*, 110 B.R. 980 (Bankr.M.D. Fla.1990). We reach the same result.

## A. PLAIN LANGUAGE

We must begin our inquiry with the plain language of the statute. As the Supreme Court has noted, "[t]he plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters.'" *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)); *see also Demarest v. Manspeaker*, —— U.S. ——, 111 S.Ct. 599, 604, 112 L.Ed.2d 608 (1991); *Smith v. Fidelity Consumer Discount Co.*, 898 F.2d 907, 910 (3d Cir.1989). With respect to the Bankruptcy Reform Act of 1978, the Supreme Court has cautioned that "[i]n such a substantial overhaul of the system, it is not appropriate or realistic to expect Congress to have explained with particularity each step it took. Rather, as long as the statutory scheme is coherent and consistent, there is generally no need for a court to inquire beyond the plain language of the statute." *Ron Pair*, 489 U.S. at 240–41, 109 S.Ct. at 1030.

We recognize that the so-called "plain meaning" rule is an "axiom of experience" and does not preclude a court from employing extrinsic aids to interpretation. *Watt v. Alaska*, 451 U.S. 259, 266, 101 S.Ct. 1673, 1677–78, 68 L.Ed.2d 80 (1981) (quoting *Boston Sand and Gravel Co. v. United States*, 278 U.S. 41, 48, 49 S.Ct. 52, 53–54, 73 L.Ed. 170 (1928)); *see also Train v. Colorado Public Interest Research Group, Inc.*, 426 U.S. 1, 10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976); *United States v.*

*American Trucking Ass'ns, Inc.*, 310 U.S. 534, 542–43, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940); *Smith*, 898 F.2d at 910. Rather, it states a useful presumption in favor of the plain meaning that may be rebutted by other evidence. This preference rests upon the sound principle that "overemphasis on legislative guides may lead to a distorted view of the statutory purpose, 'for much less thought is spent on the future implications of committee reports·and explanations on the floor than in choosing the words of a statute.'" *Paskel v. Heckler*, 768 F.2d 540, 543–44 (3d Cir. 1985) (quoting Cox, *Judge Learned Hand and the Interpretation of Statutes*, 60 Harv.L.Rev. 370, 381 (1947)); *see also Griffin*, 458 U.S. at 570, 102 S.Ct. at 3249–50 (" 'There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes.' ") (quoting *American Trucking*, 310 U.S. at 543, 60 S.Ct. at 1063). There can be no absolute rule dictating the quantum of extrinsic evidence that is necessary to overcome a facial reading of a statute. But when the statutory language speaks clearly, a party seeking to counter that language must produce other evidence that exhibits at least as much clarity.

Here, the statute plainly refers to "lessors" of aircraft that are "leased" to an airline. The sale-leaseback transactions at issue clearly were denominated as leases, although it remains to be decided whether any of these transactions were disguised security interests. Continental does not argue that the word "lease" commonly refers to only acquisition leases. Bona fide sale-leasebacks are recognized as valid leases in various legal contexts. *See, e.g., Frank Lyon Co. v. United States*, 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978) (Internal Revenue Code); *In re Fashion Optical, Ltd.*, 653 F.2d 1385, 1389 (10th Cir.1981) (bona fide sale-leaseback not fraudulent conveyance under Bankruptcy Code); *Gordon v. Motel City "B" Associates*, 403 F.2d 90 (2d Cir.1968) (New York Bulk Sales Law); *In re Chateaugay Corp.*, 102 B.R. 335, 343 (Bankr.S.D.N.Y.1989) (Bankruptcy

Code § 365). The leases in question were recorded under the Federal Aviation Act, which declares them "valid as to all persons." 49 U.S.C.App. § 1403(d) (1988).

Rather, Continental's position is that when Congress used the word "lease" in § 1110, it intended to encompass only certain categories of leases. In essence, Continental contends that Congress neglected to insert qualifying language that would have explicitly limited the application of § 1110 to acquisition leases. Thus, accepting this argument would require us to qualify the plain meaning of the statute's words. We can do so only if the application of § 1110 to non-acquisition leases would produce a result "demonstrably at odds with the intention of its drafters." We believe it would not.

Continental asserts that the meaning of the term "lease" can be discerned only by reference to the other words that surround it. Under the doctrine of *noscitur a sociis*, the meaning of an ambiguous statutory term may be derived from the meaning of accompanying terms. *See, e.g., Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961); 2A Sutherland Statutory Construction § 47.16 (1984). In addition to leases, § 1110 applies to "conditional sale contracts" and "purchase money equipment security interests." Because the latter two interests are inherently acquisition devices, Continental maintains that the term "lease" should apply only to acquisition leases.

■ However, *noscitur a sociis*, like any other tool of statutory construction, is merely an aid in determining the intent of the drafters. It is correctly employed together with other tools, such as legislative history and underlying policy concerns. It is of little help where other evidence reveals that Congress intended to treat the disputed term differently from its neighbors. When Congress has separated terms with the conjunction "or," it is presumed that Congress intended to give the terms "their separate, normal meanings." *Garcia v. United States*, 469 U.S. 70, 73, 105 S.Ct. 479, 481, 83 L.Ed.2d 472 (1984).

Furthermore, as with legislative history, when the doctrine is employed to qualify an otherwise plain meaning, its utility is decreased. As the Supreme Court has noted:

That a word may be known by the company it keeps is ... not an invariable rule, for the word may have a character of its own not to be submerged by its association. Rules of statutory construction are to be invoked as aids to the ascertainment of the meaning or application of words otherwise obscure or doubtful. They have no place ... except in the domain of ambiguity. Moreover, in cases of ambiguity the rule ... is not exclusive. The problem may be submitted to all appropriate and reasonable tests, of which *Noscitur a sociis* is one.

*Russell Motor Car Co. v. United States*, 261 U.S. 514, 519, 43 S.Ct. 428, 430, 67 L.Ed. 778 (1923) (citations omitted); *see also Donovan v. Anheuser–Busch, Inc.*, 666 F.2d 315, 327 (8th Cir.1981). As we have noted, a court is never barred from enlisting the aid of this or any other extrinsic tool, but *noscitur a sociis* is more useful when the statutory language plainly encompasses more than one meaning. Continental seeks to employ this rule to qualify language that Congress has left unqualified, rather than to clarify a facially ambiguous term. Although we do not ignore the logic of *noscitur a sociis*, we believe it does not dictate the result here, in light of the statute's plain language and evidence indicating that Congress did not necessarily intend for the term "lease" to be qualified.

Our analysis in *Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682 (3d Cir. 1991) is not to the contrary. There, we held that § 12(2) of the Securities Act of 1933 does not apply to sellers of securities in the secondary market. This statute bars misrepresentations "by means of a prospectus or oral communication." 15 U.S.C. § 771(2) (1988). The plaintiffs sought to rely on this general prohibition of oral misrepresentations, which on its face is not limited to initial offerings. In reaching our conclusion, we interpreted the term "oral communication" in connection with the term "prospectus" that appeared next to it.

Although we employed *noscitur a sociis* in qualifying an otherwise general term, we did so only in conjunction with an analysis of legislative history and policy concerns indicating Congress' clear intent. We noted that the term "prospectus" did not apply to secondary offerings, and that distinguishing between oral and written communications would make "no logical sense." *Id.* at 689. In addition, we stressed that the legislative history and structure of the 1933 Act, and its relation to the 1934 Securities Exchange Act, revealed Congress' clear intent to regulate only initial offerings. *Id.* at 689–93.

## B.  LEGISLATIVE HISTORY

The legislative history of § 1110 and the policy concerns upon which it was based do not support the application of *noscitur a sociis*. We do not discern a clear expression of Congressional intent to limit § 1110 to acquisition financing, nor do we foresee patently illogical consequences arising from a contrary interpretation. We are concerned here with the circumstances surrounding the 1978 enactment of § 1110. But in analyzing § 1110, we also find it helpful to understand the previous statutes upon which it was modelled.

### 1.  *Section 77(j)*

Section 1110, enacted with the 1978 overhaul of the bankruptcy code, has its roots in § 77(j) of the previous code. Section 77(j), enacted in 1935, applied to certain transactions involving railroad rolling stock, and provided that:

> The title of any owner, whether as trustee or otherwise, to rolling stock equipment leased or conditionally sold to the debtor, and any right of such owner to take possession of such property in compliance with the provisions of any such lease or conditional sale contract, shall not be affected by the provisions of this section.

11 U.S.C. § 205(j) (1976) (repealed). Previously, § 77 had permitted federal courts to stay any suit affecting a railroad in reorganization.

This provision was enacted to preserve a form of financing known as the "railroad equipment trust," under which transportation equipment was financed separately from a railroad's other assets. The equipment was placed in a trust and leased or conditionally sold to the railroad. Traditionally, railroad equipment trustees received priority over holders of general liens on a railroad's after-acquired property. *See United States v. New Orleans R.R.*, 79 U.S. (12 Wall.) 362, 20 L.Ed. 434 (1871). It has been suggested that this special protection was recognized because the high cost and long life span of rolling stock, combined with the railroads' frequently precarious financial situations, made such equipment an extraordinarily risky investment. Such risks were magnified if the secured property could not be recovered promptly in bankruptcy proceedings. Gerstell & Hoff–Patrinos, *Aviation Financing Problems Under Section 1110 of the Bankruptcy Code*, 61 Am.Bankr.L.J. 1, 5–6 (1987).

Section 77(j) was enacted in response to the Supreme Court's decision in *Continental Illinois National Bank & Trust Co. v. Chicago, Rock Island & Pacific Railway Co.*, 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1935), which cast doubt upon the ability of equipment trust financiers to repossess their equipment in bankruptcy proceedings. If this ability were denied, financing would become more expensive for the railroads. Congress passed § 77(j) to ensure that these financiers could act immediately upon their contractual rights of repossession. As one congressional report stated:

> In view of the necessity of readily financing purchases of equipment at a time when the development of the transportation art is providing new forms of equipment, particularly in the passenger field, of which, in interests of efficiency and economy, the carriers should be able to avail themselves, and because after a depression the carriers are usually required to make large expenditures for equipment in order to accommodate the improved traffic, your committee is of the opinion that any doubt should be

removed with reference to the validity of the equipment trust as a means of financing equipment purchases. H.R.Rep. No. 1283, 75th Cong., 1st Sess. 4 (1935).

### 2. Section 116(5)

In 1957, Congress extended § 77(j) to the airline industry. It enacted § 116(5) of the Bankruptcy Act, which provided in part that:

[T]he title of any owner, whether as trustee or otherwise, to aircraft ... leased, subleased, or conditionally sold to any air carrier ... and any right of such owner or of any other lessor to such air carrier to take possession of such property in compliance with the provisions of any such lease or conditional sale contract shall not be affected by the provisions of this chapter if the terms of such lease or conditional sale so provide.

11 U.S.C. § 516(5) (1976) (repealed).

The legislative history reveals that Congress was concerned that "[m]any of the Nation's smaller airlines are today facing serious financing problems resulting from the need to replace obsolete equipment with modern aircraft" because "the smaller lines are presently unable to attract the capital necessary for their current reequipment requirements." H.R.Rep. No. 944, 85th Cong., 1st Sess., *reprinted in* 1957 U.S.Code Cong. & Admin.News 1926, 1926. It was hoped that § 116(5) "would result in an increased availability of capital and at a lower interest rate than would be demanded under present conditions" and would cause "extensive use of equipment trust financing as the financial basis for a major reequipment program." *Id.*

In 1968, Congress extended this provision to the shipping industry. *See* 11 U.S.C. § 516(6) (1976) (repealed). The legislative history indicates that Congress was concerned with "problems of equipment obsolescence and the resulting need for capital improvements as the industry continues to modernize its fleet for service to the public." H.R.Rep. No. 1932, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. Admin.News 4279, 4280. Once again, it was hoped that the protections would "re-

sult in an increased availability of capital, and at a lower interest rate than would be demanded under present conditions." *Id.*

### 3. Section 1110

When the current Bankruptcy Code was enacted in 1978, the new § 1110 adopted § 116(5), but in somewhat altered form. Holders of purchase money equipment security interests ("PMESIs") were added to the list of protected creditors, and the debtor was given the option of curing its defaults within a specified time period. The addition of the PMESI recognized the changes brought on by the adoption of the U.C.C., which subsumed the conditional sale contract, and recognized the purchase money priority. *See* U.C.C. § 9–312(4) (1977) (recognizing non-inventory purchase money priority), *id.* comment 3 (purchase money priority embodies previous priority for conditional sales and equipment trusts). As one congressional report stated, "[b]ecause retention of the prior limitation would unnecessarily force equipment financing into outmoded forms, protection of security interests was added to make financing forms more flexible and more consonant with modern law." H.R. No. 95–595, 95th Cong., 1st Sess. 240 (1977) [hereinafter "House Report"], *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6200. The cure period was apparently added to soften the effect of the prior law, which was considered "harsh in their application." *Id.* at 239, 1978 U.S.Code Cong. & Admin.News 6198.

Although Congress noted that "changes in financing practices and in the bankruptcy laws have suggested that the former limitation [of protection to lessors and conditional vendors] be deleted," *id.* at 240, 1978 U.S.Code Cong. & Admin.News 6199, these parties remained protected by § 1110. The House Report recognized that the U.C.C. treated certain purported leases as disguised security interests, but mentioned no other distinction among leases. *See id.* Rather, Congress appeared to recognize that the protection for leases and conditional sales contracts was continued because the holder of these interests re-

tains title to the property. The PMESI, which does not transfer title to the holder, was discussed separately. As the House Report noted:

An attempt was made to preserve the limitations on the right of the financier contained in current law. However, certain changes were made. First, the proposed sections provide protection for equipment security interests. The term includes only security interests that were granted to finance the acquisition of the covered equipment. A general mortgage is excluded. Under present law, the protection applies only to leases and conditional sales of equipment. The theory behind the present limitation is that under leases and conditional sales, title of the property does not pass to the debtor, but remains in the financier. Thus, it is appropriate to exclude what is not property of the estate from the automatic stay in a reorganization case.

*Id.* Thus, § 1110 apparently was based upon two distinct theories—a "title" rationale that applies to leases and conditional sales contracts, and the modern purchase money rationale that applies to PMESIs.

In addition, the House report stated that "[t]he protection afforded the financier is similar to that contained in other sections of the bill governing use of collateral by the estate and the treatment of executory contracts and unexpired leases." *Id.* at 239, 1978 U.S.Code Cong. & Admin.News 6199. Specifically, the report noted that when a trustee elects to assume a lease, the lessor is entitled to "adequate protection," which ordinarily includes rental payments and the curing of past defaults. *See* 11 U.S.C. § 363(e) (1988). It noted that "[t]he major differences for transportation equipment security interests is that the proposed section defines more precisely what constitutes adequate protection.... In the case of a lease, the protection is the same afforded to other lessors, but the trustee is required to make a decision within 60 days of the order for relief." House Report at 240, 1978 U.S.Code Cong. & Admin.News 6199. Thus, the term "lease" in § 1110 was specifically defined in reference

to the general treatment of leases elsewhere in the code.

## C. ANALYSIS

Although there are indications that one goal of § 1110 and its predecessors was to facilitate the acquisition of new equipment, we do not believe the legislative history clearly demonstrates that this was Congress' sole aim. As we have noted, Continental's interpretation can be sustained only if the relevant evidence reveals that a contrary reading would produce a result "demonstrably at odds with the intention of the drafters." *Ron Pair*, 489 U.S. at 242, 109 S.Ct. at 1031. The legislative history is consistent with an intent to facilitate the procurement of low-cost capital in general. *See In re Pan Am Corp.*, 125 B.R. at 375–76; *In re Braniff, Inc.*, 110 B.R. 980, 984 (Bankr.M.D.Fla.1990). Furthermore, there is evidence that Congress intended to include within the scope of § 1110 all true leases, in contrast to leases that are in reality disguised security interests. Finally, accepting Continental's interpretation would recognize arbitrary distinctions among otherwise similar lease transactions, and create further uncertainties in the application of § 1110.

We recognize that the legislative history of § 1110 and each of its predecessors expresses a desire to help the affected industries modernize their fleets. However, increasing the general availability of capital is a means of accomplishing that end. As has been noted, "the encouragement of new equipment acquisition can in no way be considered directly contrary to the broad language which Congress chose to use." *In re Pan Am*, at 375. Thus, the 1957 House Report on § 116(5) recognized that equipment modernization was hampered because "the smaller lines are presently unable to attract the capital necessary for their current reequipment requirements." H.R.Rep. No. 944, 85th Cong., 1st Sess. 2, *reprinted in* 1957 U.S.Code Cong. & Admin.News 1926, 1926. It was hoped that the new provisions "would result in an increased availability of capital at a lower interest rate than would be demanded under present conditions." *Id.*

There is no clear indication in the legislative history of § 1110, § 116(5) or § 77(j) that Congress intended to limit protection to acquisition financing. In fact, in 1935 Congress was informed about the railroads' practice of "warehousing" equipment trust certificates following acquisition of the equipment, and selling them later when the funds were needed. *See Railroad Reorganization: Hearing before the House Committee on the Judiciary on H.R. 6249,* 74th Cong., 1st Sess. 96 (Apr. 17, 1935) (testimony of W.A. Law). We agree that "[i]ncluding all lessors within the scope of § 1110 ... is directly consistent with Congress' stated policy of increasing capital availability at the lowest possible cost." *In re Pan Am,* at 378. Sale-leasebacks are a major form of financing in the airline industry. Several solvent airlines, supporting the lessors as *Amici,* maintain that denying § 1110 protection to sale-leasebacks would severely curtail financing prospects for the entire industry. We believe providing protection to this form of lease financing is consistent with the legislative history of § 1110.

Continental also relies on the fact that when Congress added the PMESI to the list of protected interests, the House Report noted that a "general mortgage" would not receive protection. Continental contends that its sale-leasebacks are the functional equivalent of general mortgages on specific pieces of equipment, and thus were not intended to receive protection. We do not believe this isolated comment was implicitly intended to qualify the statutory term "lease." We note first that the words "general mortgage" could refer to a general mortgage attaching to after-acquired assets, rather than a mortgage attaching to a specific piece of equipment. But even assuming Congress was referring to loans secured by specific equipment, we do not discern that Congress explicitly intended to deny protection to bona fide sale-leasebacks.

A bona fide sale-leaseback is different from a secured loan. Unlike the holder of a security interest, the lessor retains economic ownership of the property upon the expiration of the lease. Thus, the lessor bears risks not borne by a secured party. As has been noted, "[t]he factor of economic ownership reveals the superficiality of any resemblance between the sale-leaseback transaction and a secured loan. Where the resulting lease is a true lease, a genuine change in ownership, evidenced by a transfer of residual risk, has taken place." Gerstell & Hoff–Patrinos, *Aviation Financing Problems Under Section 1110 of the Bankruptcy Code,* 61 Am. Bankr.L.J. 1, 25 (1987). During hearings on the 1978 Act, Congress was informed that aircraft lessors relied upon the residual value of the equipment for much of their profit. *See Bankruptcy Reform Act of 1978: Hearings before the Subcommittee on Improvements in Judicial Machinery of the Senate Judiciary Committee,* 95th Cong., 1st Sess. 810 (Dec. 1, 1977) (testimony of E.L. Dinius).

Congress rationally could have concluded that the greater residual risks of equipment lessors required added protection in bankruptcy. With respect to security interests, which do not involve such risks, Congress could have determined that only acquisition devices required such protection. In the category of security interests, Congress included only PMESIs and conditional sales, and indicated that a general mortgage was not included. It appears that the PMESI was added because it represents the modern form of the conditional sale. The U.C.C. subsumed conditional sale contracts into the modern system of secured financing. *See* U.C.C. § 9–102, comment 1 (1977) (conditional sale contracts governed by U.C.C.), *id.* § 9–312, comment 3 (purchase money priority embodies previous priority for conditional sales and equipment trusts). But Congress' treatment of security interests does not shed light on the intended scope of protection for true leases. *See In re Braniff,* 110 B.R. at 984 ("[w]hatever the Congress intended regarding security interests, nothing suggests that Congress intended to change the law ... regarding lease transactions.").

The legislative history indicates that Congress distinguished between leases and security interests. This fact contradicts the

application of *noscitur a sociis.* The 1978 report specifically predicated the protection of leases on the fact that title to the property remained with the lessor. Similarly, § 116(5) specifically protected the "title" of the lessor. Although the "title" theory has no place in the modern law of commercial priorities, *see* U.C.C. § 9–202 (1972), title to leased property also implies residual economic ownership and its associated risks, which are still important concerns. When the PMESI was added in 1978, Congress was clearly concerned with the distinction between true leases and "leases are merely disguised security agreements." House Report at 240, 1978 U.S.Code Cong. & Admin.News 6200. A lease that is a disguised security interest leaves essentially no residual economic ownership with the purported "lessor." *See, e.g.,* 1 Williston on Sales § 6–8 (4th ed. 1973); S.Rep. No. 95–989, 95th Cong., 2d Sess. 64 [hereinafter "Senate Report"], *reprinted in* 1978 U.S.Code Cong. & Admin.News 5850 (true lease, unlike disguised security interest, leaves economic risk with lessor at end of lease) (discussing § 507(b)(6) of the Bankruptcy Code); 55 Fed.Reg. 40502 (Oct. 3, 1990) (Federal Aviation Administration legal opinion on determining whether an aircraft lease is a true lease or a disguised security interest). Thus, Congress distinguished between leases and security interests, and rationally could have limited protection of security interests to acquisition devices, while contemplating no such limitation for leases.

As we have noted, Congress specifically directed that the term "lease" in § 1110 be considered in connection with its usage elsewhere · in the Code. Bona fide sale-leaseback transactions are treated the same as other leases under other provisions of the Code. *See, e.g., In re Fashion Optical, Ltd.,* 653 F.2d 1385, 1388–91 (10th Cir. 1981) (provisions relating to fraudulent conveyances); *In re San Francisco Industrial Park, Inc.,* 307 F.Supp. 271 (N.D.Cal. 1969); *In re Chateaugay Corp.,* 102 B.R. 335, 343 (Bankr.S.D.N.Y.1989) (§ 365). Sale-leasebacks have been used in the transportation industry for some time. *See Yorkshire Ry. Wagon Co. v. Maclure,* 21

Ch.D. 309, 319 (1882) (sale-leaseback of locomotives and wagons). At the time § 1110 was drafted, this court "recognize[d] that sale-leaseback arrangements play a useful and accepted role in our economy." *Sun Oil Co. v. Commissioner,* 562 F.2d 258, 268–69 (3d Cir.1977), *cert. denied,* 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978). Congress clearly knows how to distinguish among different forms of leases when it so desires. *See, e.g.,* 11 U.S.C. §§ 502(b)(6) (limiting damage claim under "a lease of real property"), 365(h) (regarding rejection by trustee of a "lease of real property"), 365(c) (prohibiting assumption or assignment of a lease of "nonresidential real property").

Finally, accepting Continental's position would result in arbitrary distinctions and further uncertainties. *See In re Pan Am,* 125 B.R. at 377–78. If § 1110 protects only leases directly resulting in aircraft new to the fleet, what is the status of a lease renewal for an aircraft that was originally new to the fleet? In addition, an aircraft that is sold by Continental and leased directly back to it would be subject to the automatic stay, but if the same aircraft were leased back to a different airline, it would apparently receive protection under § 1110. Furthermore, even if the bankruptcy court's "package deal" exception were adopted, coverage questions would arise when a sale-leaseback offering is delayed until some time after the initial delivery of new aircraft by the manufacturer.

We believe that following the plain language of the statute is especially important in this case, where Congress intended that commercial operators rely on § 1110 in structuring long-term deals involving costly assets. We agree that "[o]therwise, the benefit sought to be achieved by a statute like § 1110—the prospect of a quick and predictable remedy that encourages potential financers to be forthcoming—will be lost in a miasma of potential litigation." *In re Pan Am,* 125 B.R. at 378. Section 1110 was intended to facilitate the procurement of low-cost capital by providing an advantage in bankruptcy to holders of cer-

tain interests. If the application of § 1110 is not predictable, potential lessors may require additional payments to compensate for this risk of uncertainty. If Congress intends to alter the incentives of § 1110, it must do so clearly.

Although we do not find a clear indication that Congress intended to limit the application of § 1110 to acquisition leases, the foregoing discussion clearly reveals that Congress intended to protect only true leases. Unlike the acquisition issue, this interpretation does not require us to qualify the plain language of the statute. Under the U.C.C. and elsewhere, the term "lease" includes only true leases. This interpretation has been applied under § 1110 and other provisions of the Bankruptcy Code. *See, e.g., In re Pan Am*, 125 B.R. at 380 (§ 1110); *In re PCH Associates*, 804 F.2d 193 (2d Cir.1986) (§§ 365(d), 502(b)(6)); *In re Chateaugay Corp.*, 102 B.R. at 343–44 (§ 365) (and cases cited therein). The distinction between true leases and disguised security interests has long been accepted in commercial and tax law. We do not decide the precise standards under which the bankruptcy court or other court of competent jurisdiction is to decide this issue. However, we note that when Congress discussed the definition of "security interest" under the Bankruptcy Code, it noted that "[w]hether a consignment or a lease constitutes a security interest under the bankruptcy code will depend on whether it constitutes a security interest under applicable State or local law." House Report at 314; Senate Report at 26, 1978 U.S.Code Cong. & Admin.News 5812, 6271.

In sum, the legislative history simply does not reveal a sufficiently clear congressional intent that would permit us to qualify the plain words of the statute. Encouraging acquisition of new equipment was certainly one aim of § 1110. But as the district court noted, there are many ways in which § 1110 could be rewritten to reflect various goals alluded to in the legislative history. Because the legislative history reflects a strong concern with fleet modernization, it could be argued that § 1110 should apply only to newer equipment. Similarly, because the 1957 legislative history was concerned only with the financial condition of "smaller carriers," it could be argued that § 1110 should apply only to those entities. *In re Continental*, 125 B.R. at 411. Absent clearer evidence of Congress' actual intent, we must follow the plain language of the statute. We leave it to Congress to qualify that language further.

### IV.

We hold that § 1110 applies to bona fide sale-leaseback transactions. Thus, we will affirm the order of the district court and remand for proceedings consistent with this opinion. Nothing herein shall be construed as limiting the right of any lessor to institute repossession proceedings upon the expiration of the statutory cure period.

BECKER, Circuit Judge, concurring in the judgment.

I agree with most of what Judge Scirica says in the opinion of the court. However, I am not as certain as Judge Scirica that the language of the statute is "plain." We do not read statutes in a vacuum. The critical statutory sentence that we must construe[1] is grammatically awkward, is fairly opaque, and is freighted with references to instruments (PMESIs and conditional sales) generally considered to be limited to acquisition financing. Moreover, notwithstanding that non-acquisition sale-leaseback arrangements are technically "leases," there is no denying that the word

---

1. The relevant sentence states:

(a) The right of a secured party with a purchase-money equipment security interest in, or of a lessor or conditional vendor of, whether as trustee or otherwise, aircraft, aircraft engines, propellers, appliances, or spare parts ... that are subject to a purchase-money equipment security interest granted by, leased to, or conditionally sold to, a debtor that is an air carrier ..., to take possession of such equipment in compliance with the provisions of a purchase-money equipment security agreement, lease, or conditional sale contract, as the case may be, is not [unless otherwise provided] affected by section 362 or 363 of this title or by any power of the court to enjoin such taking of possession....

11 U.S.C. § 1110 (1988).

commonly connotes an acquisition device. In other words, although I concede that the language of the statute certainly is susceptible to the meaning that Judge Scirica attributes to it—and probably even means what he says it does—I am left with serious doubts.

On the other hand, when I go to the legislative history, which Continental touts as its forte in this case, and even when I acknowledge the frequent references to new acquisition in § 1110's predecessor statutes, I nonetheless find Continental's position underwhelming. That is because, as is referenced by Judge Scirica, the legislative history contains countervailing evidence: (1) that the sale-leaseback device had long been used for non-acquisition financing;[2] and (2) that Congress had long been concerned with the general cost of capital in various transportation industries and was not just focusing on acquisition financing. In other words, the legislative history seems to me to be a stand-off.

What is determinative for me is the fact, noted above, that Congress well knew the non-acquisition potential for sale-leaseback financing yet did not do what would have been so simple, i.e., to add the two little words "newly acquired" to the statute to avoid any question. Given this equivocal legislative history, it is my view that since the statute could very well mean what the lessors say it means,[3] the factors noted above—the failure of Congress clearly to impose the acquisition limitation which Continental reads into the statute coupled with the fact that Congress had to know that it might be creating an ambiguity by leaving the limitation out—are fatal to Continental's position. I therefore concur in the judgment of the court.

---

**2.** *Amici* also make a forceful argument in this regard that even conditional sales have been used for more than a century as a means of non-acquisition financing and that Congress was aware of this practice.

**3.** Thus, this might be styled as a case of "somewhat plain meaning."